*Abedini et al., v. The Government of the Islamic Republic of Iran, et al.*

Case No. 1:18-cv-588 (JEB)

# EX. C. TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT

# Expert Report of Dr. Mehdi Khalaji

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SAEED ABEDINI | ) | |
| 408 Mill View Lane | ) | |
| Lynchburg, VA 24502 | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| ZIBANDEH ABEDINI GALANGASHY | ) | |
| 408 Mill View Lane | ) | **Case No.: 1:18-cv-588 (JEB)** |
| Lynchburg, VA 24502 | ) | |
|  | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
|  | ) | |
| THE GOVERNMENT OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| Its Ministries, Agencies, and Instrumentalities | ) | |
| c/o Ministry of Foreign Affairs | ) | |
| Khomeni Avenue | ) | |
| United Nations Street | ) | |
| Tehran, Iran, | ) | |
|  | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF MEHDI KHALAJI**

## I.    QUALIFICATIONS

1.    I have been a senior fellow at the Washington Institute for Near East Policy since 2005. The Washington Institute ("TWI") was founded in 1985, and its mission is to advance a balanced and realistic understanding of American interests in the Middle East and to promote the policies that secure them. It is one of the internationally recognized Washington-based think tanks, which is non-profit and non-partisan, and provides policy advice to the U.S. government as well as consultation to U.S. allies especially in Europe and Middle East and around the globe in general.

2.    My work there focuses on the behavior and politics of Iran and the Shiite community in the Middle East. I have written dozens of op-eds, articles and reports on the aforementioned subjects which are published on the Washington Institute's website as well as other media outlets such as New York Times, Washington Post, Wall Street Journal, Foreign Policy, CNN, and Journal of International Affairs. Furthermore, I contribute on the regular basis to radio and TV programs specially on BBC as an Iran analyst and give interviews to American and European mainstream newspapers and news agencies like Reuters, Associated Press, New York Times, Washington Post, Wall Street Journal, Le monde, and The Guardian.

3.    I provide policy advice and consultation to the U.S. government and its allies on Iran and Shiite politics in the region. I am consulted by the White House, National Security Council, State Department, and Defense Department frequently, specially on U.S.-Iran relations and Iran's nuclear policy, including by U.S. nuclear negotiation team led by Wendy Sherman between 2013-2015.

4.     In addition to supervising TWI's Persian website

(https://www.washingtoninstitute.org/fa) I am writing a book on the political biography of

Ayatollah Ali Khamenei, Iran's supreme leader, which is going to be published next year.

5.     For information data, I rely on open sources as well as my daily contacts with

Iranian journalists, political activists and influential social groups inside Iran. I have a vast and

intimate knowledge about the policy decision-making process in Iran, individuals and institutions

involved in it, as well as Iranian leader's mindset, especially Ayatollah Ali Khamenei, who is

regarded as the ultimate decision maker in the country. Beside the forthcoming aforementioned

book on Khamenei, I have published several studies on this subject, including: Tightening the

Reins: How Khamenei Makes Decisions (https://www.washingtoninstitute.org/policy-

analysis/view/tightening-the-reins-how-khamenei-makes-decisions) and The Future of

Leadership in the Shiite Community (https://www.washingtoninstitute.org/policy-

analysis/view/the-future-of-leadership-in-the-shiite-community ).

6.     I am also the CEO at Idea Center for Arts and Culture, a company based in

Washington, D.C. The Idea Center for Arts and Culture (IDEACAC) facilitates for Western

audiences a cultural dialogue and a local-level understanding of the Middle East, Africa, East

and Central Asia, the Indian Subcontinent, and Latin America. Our approach utilizes a network

of renowned intellectuals, writers, and artists from various disciplines to provide a native,

"inside-looking out" perspective through consulting, publications, conferences, festivals,

exhibitions, and other events.

7.     I have attached my curriculum vitae to this Report as Exhibit A and ask that it be

incorporated by reference into this Report for the Court's consideration. I will summarize

relevant portions of it here. From 1986 to 2000, I studied and trained in the seminaries of Qom,

the traditional center of Iran's clerical establishment. I studied Shiite theology and jurisprudence, earning the Iranian equivalent of a Ph.D. in Shiite Theology, Law and Exegesis from the seminary in Qom and a Master's Degree in Western Philosophy from the University of Tarbiat Modarres in Qom. As part of my studies and training in Iran, I conducted extensive research on modern intellectual and philosophical-political developments in Iran and the wider Islamic and Western worlds. In Qom, and later in Tehran, I also worked as a journalist, serving on the editorial boards of a theological journal, Naqd va Nazar, and a political daily, Entekhab.

8.      In 2000, I moved to Paris to continue my studies at the Sorbonne, in the Ecole Pratique des Hautes Etudies, where I focused on Shiite theology and exegesis. I earned a doctoral degree from the Sorbonne in 2004. I worked for BBC Persian as a political analyst on Iranian affairs, and eventually became a broadcaster for the Prague-based Radio Farda, the Persian-language service of the U.S. government's Radio Free Europe/Radio Liberty. At Radio Farda I produced news, features, and analysis on a range of Middle Eastern, Iranian, and Islamic issues. As a senior fellow at the Washington Institute, I have continued my work on Iranian and Shiite politics, with a particular emphasis on the conduct and motivations of the Iranian government and its leaders, officials, agents, and proxies. As a result of my years of researching, studying, and analyzing Shiite theology, Iranian politics, and Iranian government behavior and motivations, I have become an expert on matters implicated in this litigation—including the Iranian government's practices with respect to the arrest, detention, and treatment of Iranian-American dual nationals.

9.      I have testified as an expert by deposition or at trial in the last four years as follows: United States v. Lahiji, 3:10-CR-00506-KI (D. Or. 2013).

10.     I have provided expert reports in the following cases: Moradi v. Islamic Republic
of Iran, 1:13-cv-0599-ESH (D.D.C. 2014); Hekmati v. Islamic Republic of Iran, 1:16-cv-00875-
ESH (D.D.C. 2017); Jason Rezaian v. Islamic Republic of Iran.

11.     I have testified as an expert on January 9, 2019 in the following hearing: Jason
Rezaian v. Islamic Republic of Iran.

12.     I have authored numerous publications in the past ten years and participated in
many relevant speaking engagements, a list of which is attached as Exhibit B.

## II.     REPORT

### A.  Background

13.     I have been asked to submit this report by Mr. Christopher M. Seleski Esq.,
Tolmage Peskin Harris & Falick, counsel for Saeed Abedini and his family in a lawsuit against
the Islamic Republic of Iran. I was asked whether in my professional opinion Mr. Abedini was
illegally arrested and detained by agents of the Islamic Republic of Iran in order to gain leverage
over—and ultimately to obtain concessions and other things of value from—the United States or
other parties. I was also asked whether in my professional opinion Mr. Abedini's treatment by
agents of the Islamic Republic of Iran complied with Iranian law. I have reviewed the Abedini's
legal complaint, which sets out the circumstances of Saeed Abedini's detention and confinement
in Iran from 2012 to 2016.

14.     The opinions set forth below are based upon my education and my professional
experience, particularly my research into the behavior, politics, and jurisprudence of the Iranian
government and its agents. In preparing this report, I have reviewed and analyzed documents and
sources typically relied upon by experts in my field, including legal texts and reports in English-
language and Iranian media.

4

15.     Based on my analysis of the Abedini's legal complaint, other cases involving dual American-Iranian citizens, and the political and diplomatic context in which Mr. Abedini's arrest and detention occurred, I believe that Mr. Abedini was illegally arrested, detained, and abused by the Government of Iran as part of an effort to extract concessions and other things of value from the United States. I also believe that Mr. Abedini's treatment by Iranian agents during his captivity violated Iranian law.

**B. Iran's Illegal Treatment of Dual Citizens**

16.     The Iranian government has a well-established practice and a well-documented history of arresting, detaining, and abusing or torturing dual Iranian-U.S. nationals for the purpose of extracting concessions and things of value from the United States government or its agents. This includes repeated illegal arrests, torture, denial of proper legal representation, and indefinite detention. Based on my professional experience and academic training, and my review of the facts in this case, I believe Iran's purpose and specific intent in this particular case was to arrest and detain Saeed Abedini for the purpose of gaining greater leverage and extracting certain concessions from the United States in the context of ongoing negotiations, much like Iran has done in several other well-known cases involving dual nationals, which I discuss in greater detail below.

17.     The arrest, detention, isolation, abuse, mistreatment, and legal process described in the Abedini complaint are contrary to Iranian law. Article 32 of the Islamic Republic Constitution states: "No person may be arrested except according to and in the manner laid down in the law.  If someone is detained, the subject matter of the charge, with reasons (for bringing it), must immediately be communicated and explained in writing to the accused. Within at most 24 hours, the file on the case and preliminary documentation must be referred to the competent

legal authority. Legal procedures must be initiated as early as possible. Anyone infringing this principle will be punished in accordance with the law." Similarly, Article 36 reads: "The passing and execution of a sentence must be only by a competent court and in accordance with law."

18.     The Islamic Republic's Constitution also recognizes an individual's right to a lawyer of his own choosing to represent the individual in court. Article 35 of the Islamic Republic's Constitution states: "In all courts, both parties to the claim are entitled to select a lawyer for themselves. If they do not have the capacity to do this, the means of a lawyer being appointed to act for them must be made available to them."

19.     Articles 32, 35, 36, and 38 are aimed at protecting the rights of Iranian citizens, which include dual Iranian-U.S. citizens. These articles, however, have not been followed in practice, as demonstrated by instances of Iranian-U.S. dual nationals being arrested, tortured, tried, and sentenced illegally without representation by a lawyer of the defendants' own choosing.

20.     The Islamic Republic's "Islamic Penal Law" does not authorize Iranian officials to detain an individual—and deprive him of his right to be free—for political purposes unrelated to criminal justice. For example, the Islamic Penal Law does not authorize Iranian officials to detain an individual for the purpose of gaining leverage over, or extracting concessions from, a third party such as the United States. Nor does Iranian law allow Iranian officials to deny due process or to convict a defendant without any legal basis. To the contrary, it imposes criminal penalties on government officials or employees who subject individuals to arrest, detention, and criminal process without any basis in Iranian law. Article 570 of the law reads: "If any of the government's officials or agents illegally deprive an individual from his/her right to be free or from his/her rights recognized in the Constitution, they should be dismissed and not allowed to

6

work in the government from 3 to 5 years and will be sentenced to prison from 6 months to 3 years." Article 572 further provides that if a person is illegally arrested and files a lawsuit concerning his or her illegal arrest against police agents or justice department employees, those officials who ignore his lawsuit should be permanently dismissed from their position and cannot be hired by the government for another job from 3 to 5 years. Likewise, those who order an illegal arrest, who convict defendants without legal ground, or who illegally hold prisoners, are guilty according to "Islamic Penal Law" and should be removed from their positions for a period of time based on the circumstances of each individual case (Articles 573, 574, 575, 576, 577).

21.     Iranian law also imposes criminal penalties on Iranian government officials, employees, and agents who physically harass or torture individuals to obtain confessions under duress. Article 578 provides that: "any judicial or non-judicial government employees or agents who physically harass or torture an individual in order to force him to make a confession will be imprisoned from 6 months to 3 years. In addition, he should pay compensation or retribution based on each case.  The person who ordered such a crime only goes to prison. If the defendant dies as a result of the harassment, the person who implements the harassment will be punished as a murderer and the person who ordered the harassment will be punished as someone who ordered the murder."

22.     Torture is illegal both in Islamic jurisprudence—which is the basis for the Islamic Republic's legal system—and in the Constitution of the Islamic Republic of Iran. Article 38 of the Islamic Republic's Constitution reads: "All forms of torture for the purpose of extracting confession or acquiring information are forbidden. Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid of value and credence. Violation of this article is liable to punishment in accordance

with the law." Under this article, the Islamic Republic is prohibited from trying and convicting individuals who have been tortured or were forced to confess. Any confession made under torture has no legal value and cannot be cited as proof against the confessor. Despite these legal prohibitions, however, it is evident from my research and analysis of this and past cases involving Iranian-U.S. citizens held and tried illegally by the Iranian government, that the Iranian government and its agencies have a pattern and practice of arresting, detaining, and torturing Iranian-U.S. citizens in an effort to extract false confessions that can then be used to obtain unjustified convictions in Iranian courts. The Iranian government then uses such convictions and confessions to support and advance Iran's political agenda and goals.

23.    Iran's conduct also violates Iran's obligations under international law, which are binding on Iran as a matter of both international and domestic law.  For example, Iran is party to international human rights treaties such as The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (United Nations Convention Against Torture), which prohibits the type of abuse to which Mr. Abedini was subjected to while imprisoned in Iran. According to Article 9 of Iran's "Civil Law," Iran treats as binding domestic law the U.N. Convention Against Torture and any other international agreements to which Iran is a party.

24.    An Opinion adopted by the United Nations General Assembly on August 26, 2013, specifically found that Mr. Abedini's imprisonment was arbitrary and his treatment while imprisoned violated several articles under the United Nations Convention Against Torture. I have attached a copy of the Opinion as Exhibit C.[1]

25.    Iranian law also prohibits detention in solitary confinement, except in special cases where it is deemed necessary. Iranian prison law (executive orders regarding prison and

---

[1] *See also* Opinion No. 39/2008 *(Islamic Republic of Iran)*, adopted on 24 November 2008.

8

correction centers) recognizes that solitary confinement is the harshest permissible treatment of a prisoner and should be used only as a "last resort." If the Discipline Council of Prison condemns a prisoner to 20 days in solitary confinement, he/she should not be deprived of other advantages like leaving their cell to get fresh air, having access to library and reading tools, and receiving appropriate nutrition. Holding a prisoner in solitary confinement for more than 20 days is illegal. Other than the Discipline Council of Prison, no other official or institution has authority to force solitary confinement on a defendant awaiting trial or on a convicted criminal.

26.     Notwithstanding the requirements of Iranian law and the international human rights documents to which the Islamic Republic of Iran is party, Iran has subjected dual citizens to inhumane treatment and illegal detention and has placed persons in prolonged solitary confinement without applying approved procedures. The Islamic Republic has a long record of misusing solitary confinement, abusing the human rights of prisoners, and flagrantly mistreating Iranian-U.S. nationals to intimidate and gain leverage over the United States and advance the political and strategic interests of the Iranian state.

27.     Many of the worst abuses occur at Evin Prison, where Iran incarcerates political prisoners, dissidents, and high-value hostages such as Mr. Abedini. Evin is a notorious political prison located north of Tehran. It was built before the Revolution but has been significantly expanded in the last four decades. In a single year—1988—nearly 4000 political prisoners were executed in Evin prison without trial. Most well-known political prisoners are kept in Evin Prison, regardless of where they are from or where they were arrested. Prisoners at Evin are routinely subjected to physical and psychological torture, including long periods of solitary confinement, harsh interrogations, beatings, and sexual assault. Interrogators use these and other illegal tactics to secure false confessions. There are countless examples, such as Iranian-

Canadian political prisoner Zahra Kazemi-Ahmadabadi, who was tortured and killed in Evin prison in 2003.

28.     Rajai-Shahr Prison is located west of Tehran in Gohardasht neighborhood, Karaj city. It is notorious for its appalling conditions and known as one of most dangerous prisons in Iran.

29.     There are two types of cruelty that goes on in Rajai-Shahr Prison. First, the government systematically abuses prisoners and violate their legal and human rights, deprive them from having necessary health amenities and keeps their access to medical services over-limited and arbitrarily random. This is a place where horrifying unjustified executions, unwarranted long-term imprisonment and atrocious solitary confinement are regularities.

30.     Second, as one the main and largest prisons near the capital, Rajai-Shahr Prison houses large concentrations of criminals who are condemned to either death or long term prison for mischievous behavior and illegal acts. The officials deliberately allow the prisoners to be mistreated by each other. Therefore, the government ignores systematic crimes committed inside the prisons from rape to drug sales and abuse. New prisoners often become victims of physical abuse, bullying and subjugation.

31.     What gives Rajai-Shahr Prison a special reputation is that official regard it as an intimidating place to punish political/religious prisoners, civil society activists and journalists who are persecuted through an extrajudicial process for their civil and totally legitimate activities. Transferring such prisoners to Rajai-Shahr Prison is an established pattern of punishment by forcing non-criminals to share the same physical space and inhumane cruel environment with dangerous violent criminals who are free to commit further crimes against other prisoners. Rajai-Shahr Prison is regularly used as leverage against those prisoners who

resist officials' illegal demands such as demand for false confession or revealing information about other citizens' privacy.

32.    According to human rights watchers, the situation in Rajai-Shahr Prison is so hazardous that there are dozens of individuals who have been reportedly transferred to Rajai-Shahr Prison but the Iranian government refuses to give any information about them and prevents their access to their family and lawyers, even for years.

33.    I will now provide some other prominent examples of Iranian-U.S. targets who were illegally arrested and detained by the Iranian government. These examples—which are by no means exhaustive—cover the period from 2007 and 2016, leading up to, during, and after Mr. Abedini's imprisonment. Based on my review of these cases, I believe Iranian-U.S. dual nationals are arrested, imprisoned, abused, tortured, forced to confess, and wrongfully convicted not for any legally-justifiable reasons, but rather as part of Iran's longstanding practice of using dual nationals to advance its political agenda, make political points, and obtain concessions and other things of value from the United States and others. Iran's pattern of behavior has emerged in the context of the ongoing tension and suspicions between Iran and the United States. Dual Iranian-U.S. nationals are held to make political points against, obtain concessions from, and maintain leverage over the United States.[2]

### a.    Kian Tajbakhs

34.    Kian Tajbakhsh is an Iranian-U.S. dual citizen held in Iran's Evin Prison. He was first arrested at his home in Tehran on May 11, 2007, after being wrongly accused along with

---

[2] *See Why Iran Freed Roxana Saberi*, ROOM FOR DEBATE, A *NEW YORK TIMES* BLOG (May 11, 2009, 2:47 pm), https://roomfordebate.blogs.nytimes.com/2009/05/11/why-iran-freed-roxana-saberi/ (hereinafter "*Saberi*") (statement of Robin Wright, policy scholar at the Woodrow Wilson International Center for Scholars; *see also id.* (statement of K. Sadjadpour, Carnegie Endowment for International Peace) ("[H]ard-line factions in Tehran have a history of provoking international incidents to advance their domestic political agendas.")

three other Iranian-Americans of endangering national security. Kian is an international scholar,
social scientist, and urban planner. He has taught in the United States and Iran. Mr. Tajbakhsh
holds various memberships and associations, including the American Sociological Association
and the Iranian Sociological Association. He was released in 2007, but then rearrested again in
Tehran on July 9, 2009. [3] Mr. Tajbakhsh was sentenced to 15 years in prison but had his prison
term cut to five years in early 2010. He has been released since then, but he is not permitted to
leave Iran. He is among various other dual Iranian-American citizens who are or recently have
been in Iranian custody, and whom the Iranian government believes it can use to advance its
political agenda and potentially gain concessions and other things of value from the United
States and others in the process.

35.     In a letter signed by some 20 members of the Columbia University faculty
concerning Mr. Tajbakhsh's imprisonment and addressed to U.S. Secretary of State Hillary
Clinton, Ken Prewitt, vice president for Global Centers and Carnegie professor of public affairs
at Columbia, asserted that that there was "nothing political about his work" and that there was no
legal basis to arrest and detain him. Secretary Clinton agreed, stating in response that the
"espionage charges against him are groundless."[4]

36.     Mr. Tajbakhsh's imprisonment appears to have no basis in law, as the Iranian
government has failed to provide any credible evidence that he engaged in espionage. Based on
my review of the facts of Mr. Tajbakhsh's case, I believe that he was detained—and cannot leave
Iran—in part because Iran believes it can use him as it has used other dual nationals, i.e., to

---

[3] *See* Brian Kates, *Iran Convicts American Academic Kian Tajbakhsh For Role In Election Protest*, DAILY NEWS
(Oct. 20, 2009), http://www.nydailynews.com/news/world/iran-convicts-american-academic-kian-tajbakhsh-role-
election-protest-12-years-prison-article-1.385567.
[4] Adam Piore, *Kian Tajbakhsh, Still Captive in Iran*, ColumbiaNews (Feb. 19, 2010),
http://archive.news.columbia.edu/home/1924.

accomplish Iranian political objectives that are unrelated to justice and that may enable Iran to obtain something of value in exchange for his freedom. I also believe that his Iranian-American dual citizenship played a major role in his wrongful detention.

        **b.**    **Roxanna Saberi:**

37.     Roxana Saberi is an Iranian-American journalist who was tried and originally sentenced to 8 years in prison in April of 2009.[5] Ms. Saberi was first detained in January 2009, accused of buying a bottle of wine. A Revolutionary Court in Iran convicted her on counts of espionage two months later.[6]

38.     Ms. Saberi, unlike other western journalists who were simply arrested and expelled from the country, had a one-day trial with no legal defense because she was a dual Iranian-American citizen. Id. Her case shows how dual citizens have been unjustly experiencing discrimination and prejudice simply because they also possess American citizenship and therefore can provide valuable leverage to help Iran accomplish its objectives. There was no evidence to suggest that Saberi was acting against the regime, and despite lack of any evidence, Ms. Saberi was nonetheless convicted. Iranian officials conceded that the espionage charges against her were baseless.[7]

39.     The speed of Ms. Saberi's conviction, appeal, and subsequent release has led experts to conclude that Iran held her to achieve its political ends. Explanations for Ms. Saberi's arrest ranged from measures aimed at testing President Obama's position on Iran to using her as

---

[5] *See Saberi, supra* n.1.

[6] *Id.* (statement of J. Simon, Executive Director of the Committee to Protect Journalists).

[7] *Id.* (Sadjadpour statement).

leverage during negotiations.[8] She was released after international pressure made the actions politically unproductive.[9]

          **c.     Parinaz Azima (Nazi Azima):**

40.     Parinaz Azima was an Iranian-American journalist with Radio Free/Radio Liberty who was charged by Iran's Prosecutor's Security Office with acts against national security and spreading propaganda about the Iranian state through her work. Azima had her passport confiscated upon her arrival at Tehran's airport on January 25, 2007, while she was in Iran visiting her mother.[10]

41.     Ms. Azima's lawyer said that "[i]f it was an ordinary case and not a political and security one, then it would have been closed within four months . . . it's a special case with security and political implications."[11]

42.     Analysts concluded that Azima's detention was most likely the result of the Iranian government's attempts to gain something of value by holding her, including by using her to help "muffle critics of the Iranian regime, both inside and outside the country."[12] Bill Samii, an analyst on Iran with the Center for Naval Analyses in the United States, stated that Iran used her to, among other things, send "the message . . . that if you cooperate with the United States in any kind of activity that could be labeled as anti-regime, then you face imprisonment at the very

---

[8] *See, e.g.*, Nioucha Homayoonfar, *Roxana Saberi is Released While Other Journalists Languish in Iran's Prisons*, THE WORLD POST (undated), http://www.huffingtonpost.com/nioucha-homayoonfar/roxana-saberi-is-released_b_201583.html.

[9] *See id.*; *see also Saberi*, *supra* n.1.

[10]*See* Press Relase, *Iran: Amnesty International Condemns Harsh Sentence For Iranian-American Journalist Roxana Saberi* (March 27, 2011), http://www.amnestyusa.org/news/press-releases/iran-amnesty-international- condemns-harsh-sentence-for-iranian-american-journalist-roxana-saberi.

[11] *See RFE/RL Journalist Azima Arrives in United States*, RadioFreeEurope/RadioLiberty (Sept. 19, 2007, 8:52 am), http://www.rferl.org/content/article/1078698.html.
[12] *Id.*

14

least."[13] Azima was released only when the regime concluded it could derive no continuing political benefit or other value from her detention.[14]

### d.    Haleh Esfandiari

43.    At the time of her imprisonment in 2009, Mrs. Haleh Esfandiari was a 67-year-old grandmother who was in Iran to visit her 93-year-old mother. Esfandiari is the Iranian-American director of the Woodrow Wilson Center's Middle East Program. Her Iranian and American passports were seized and her mother's home raided in a staged armed robbery.[15]

44.    Iranian authorities interrogated her for almost eight months, nearly four of them inside Evin prison, seeking to force her to confess that she played a central role in an American plot to topple the Iranian government. According to Ms. Esfandiari's account of her detention, the authorities "asked her to tell them about meetings that had never taken place, and people she'd never met; they asked her the same questions, in jumbled order, with numbing frequency, hoping to catch her in a lie."[16]

45.    Ms. Esfandiari was caught between two struggles which led to her arrest. One of these struggles involved tensions between the United States and Iran and the other involving an internal struggle between Iran's hardliners and the more moderate faction within the Iranian government. Authorities believed that given Ms. Esfandiari's Iranian-American status, she fit a mold that linked these two enemies.[17]  Her detention marked yet another example of Iran's punishment of Iranian-Americans simply because they possess dual citizenship and therefore are especially valuable as a means of sending political messages, obtaining political benefits, or

---

[13] *Id.*

[14] *Id.*

[15] *See* Laura Secor, *Haleh Esfandiari: Prisoner of Tehran*, NEW YORK TIMES SUNDAY BOOK REVIEW (Nov. 20, 2009), http://www.nytimes.com/2009/11/22/books/review/Secor-t.html?_r=0.

[16] *Id.*

[17] *Id.*

extracting concessions. Her case fits the pattern of Iran's mistrust and suspicions towards Iranian-Americans, stemming from the political tensions occurring at the time.[18]

### e.   Reza Shahini:

46.     Reza Shahini, an Iranian-American, was arrested in July 2016, tried without legal representation, and sentenced to 18 years in prison for "collaboration with a hostile government" in October 2016. Shahini, 46, had left Iran as a refugee 16 years prior, and had attended university in San Diego. According to his partner, he had traveled to Iran to visit his sick mother.[19] He was released on bail in April 2017 but not permitted to leave Iran. Based on my analysis of similar situations, I believe that he has not been allowed to leave Iran so that the Iranian government can easily take him back into custody and use him for leverage in the same manner as it has used other dual nationals.

### f.   Siamak and Bagher Namazi (son and father):

47.     Iranian-American Bagher Namazi is a former senior official with the United Nations' Children's Fund (UNICEF), and his son, Siamak, is a manager of Dubai based consulting company Atieh Bahar LLC. Siamak Namazi was arrested in the Tehran airport upon his arrival to visit Iran in October 2015. Bagher Namazi was arrested on February 22, 2016 after he reportedly travelled to Iran to attempt to visit his imprisoned son. In a closed-door trial, both

---

[18] More information on these cases is available in the following books: Haleh Esfandiari, *My Prison, My Home: One Woman's Story of Captivity in Iran*, Ecco; Reissue edition (October 5, 2010); Ramin Jahanbegloo, *Time Will Say Nothing: A Philosopher Survives an Iranian Prison*, University of Regina Press (October 10, 2014); Roxana Saberi, *Between Two Worlds: My Life and Captivity in Iran*, Harper; First edition (March 30, 2010); Maziar Bahari, *Then They Came for Me: A Family's Story of Love, Captivity, and Survival*, Random House; First edition (June 7, 2011).

[19] *See* Melissa Etehad and Shashank Bengali, *Iran Sentences Another American, A 46-Year Old From San Diego, To Prison For 'Collaborating' With the U.S.*, LOS ANGELES TIMES (Oct. 25, 2016) (10:10 am), http://www.latimes.com/world/la-fg-iran-prisoner-20161025-snap-story.html; Peter Rowe and Tatiana Sanchez, *San Diego Man Is Detained In Iran; 'He Just Disappeared," Friend Says*, LOS ANGELES TIMES (July 21, 2016) (10:15 pm), http://www.radiofarda.com/a/b5_iran_arrests_iranian_american_reza_shahini/27872257.html.

were accused of "cooperating with a hostile government" sentenced to ten years in prison.[20]

Notably, Iran's conviction of the Namazis followed by roughly a month the U.S.-Iranian prisoner

exchange and payment that led to the release of Mr. Abedini and three other Americans. The

Namazi case demonstrates that the Iranian government is likely to continue to arrest, detain, and

convict dual Iranian-U.S. nationals—for crimes they clearly did not commit—for as long as such

individuals provide Iran with the leverage it needs to obtain concessions and other things of

value from the United States or others. Both Namazis are still in prison.

C.      **Negotiations Concerning Iran's Nuclear Program**

48.      Beginning in 2006, the government of Iran, the five permanent members of the

U.N. Security Council along with Germany (the "P5+1"), and the European Union entered into

negotiations concerning the future of Iran's nuclear program.

49.      The P5+1 and the EU imposed sanctions on Iran to pressure the Iranian

government into abandoning any plans to develop a nuclear weapon. The Iranian government

maintained that these sanctions were unwarranted and illegal.

50.      In 2011, Iranian leadership agreed to open a secret but direct negotiation channel

with United States through Oman, after finding the sanctions' pressure unbearable and getting

seriously concerned about what is called "Arab Spring", especially broad protest in Syria, Iran's

unmatched strategic ally, and its grave ramifications for Iran's status in the region. Mr. Abedini

was arrested on July 28, 2012 and taken to Evin Prison on September 26, 2012, while secret

nuclear negotiations between U.S. and Iran were going on.

---

[20] Thomas Erdbrink, *Tehran Sentences Iranian-American Businessman to 10 Years, Report Says*, NEW YORK
TIMES (Oct. 18, 2016), https://www.nytimes.com/2016/10/19/world/asia/siamak-namazi-iran-prison.html?_r=0.

51.     In 2013, the relatively moderate Hassan Rouhani was elected President of Iran.
Although true power in Iran rests in the hands of the Supreme Leader, Rouhani's election
empowered moderates, including proponents of a negotiated resolution of the nuclear issues.
Such negotiations were opposed by hardline elements of the government and military,
particularly the Islamic Revolutionary Guard Corps ("IRGC").

52.     In late 2013, Iran and the P5+1 agreed to an interim framework under which the
parties would negotiate a comprehensive agreement to roll back sanctions and allow Iran to
pursue civilian nuclear power in exchange for the abandonment of Iran's pursuit of a nuclear
weapon. The Iranian Government transferred Mr. Abedini from Evin Prison to Rajai Shahr
during this time and housed him with dangerous criminals.

53.     The interim framework – known as the "Joint Action Plan" – called for six rounds
of negotiations. The final scheduled round of negotiations occurred from July 2 to July 19, 2014.

54.     The parties agreed to extend the deadline to November 24, 2014. Additional
rounds of negotiation occurred from September 19 to September 26; from October 14 to October
16; and from November 18 to November 24. Throughout this period, the United States and Iran
engaged in several bilateral sessions, including on August 7; September 4 to September 5;
September 18; and October 14.  Once again, the parties were unable to reach an agreement by
the deadline. Because the parties agreed that significant progress had been made, the deadline
was again extended, this time to July 1, 2015.

55.     Additional rounds of negotiations between Iran and the P5+1 took place on
December 15; from January 15 to 18, 2015; from February 18 to February 20; from March 17 to
March 20; and from March 25 to April 2. On April 2, the parties announced a tentative
agreement, with details to be finalized by June 30, 2015. On August 15, 2015, Iran provided the

18

International Atomic Energy Agency ("IAEA") with information concerning several outstanding issues related to its nuclear program.

56. On October 10, 2015, the Islamic Consultative Assembly—Iran's Parliament—approved a preliminary bill supporting the nuclear deal. A final bill was approved on October 13, 2015. The Guardian Council, which must approve all legislation, ratified the bill in October.

57. On January 16, the IAEA verified that Iran had met its initial obligations under the nuclear deal. Under Resolution 2231, sanctions related to Iran's nuclear program were lifted. A day later, the Iranian Government released Mr. Abedini and three other Americans in exchange for the U.S. release of Iranians held in U.S. custody; at the same time, the United States paid the Iranian Government $1.7 billion, which the U.S. Government said was to settle a longstanding dispute and which Iranian officials suggested was a payment for the release of Mr. Abedini and three other Americans.

58. The official nuclear negotiations had started back in 2013 only after Ayatollah Khamenei had given his permission to allow the Iranian government to move forward; Ayatollah Khamenei has the ultimate authority within the Iranian government to make decisions on major matters of foreign, regional, military and nuclear policy. While he blessed the negotiations and ultimately blessed the deal that was struck, he had remained skeptical during the negotiations. Indeed, he never stopped casting doubt on the wisdom and value of the negotiations, and he has always questioned "the enemy's trustfulness." Despite negotiations with the West on the nuclear program, and the nuclear deal that was struck, anti-Americanism remains as the enduring principle of the Islamic Republic of Iran's foreign policy. For instance, in January 2016, just days before the deal went into effect, the IRGC arrested ten American sailors after two small American naval crafts entered Iranian waters in Persian Gulf. Rouhani's government worked

19

hard to convince Ayatollah Khamenei that such actions could destroy the nuclear deal. Notwithstanding this advice, on January 25, 2016, Ayatollah Khamenei met with the IRGC members who arrested the American sailors and praised them for confronting the "enemy's crossing the line" by describing such action as a "very right move."

### D.    Iran's Annual Expenditure for Terrorism

59.    Iran does not publish its budget for supporting terrorism. However, Iran announced that in this year's national budget 1,000 billion rials has been added to Quds Force budget. The Quds Force is a unit of Iran's Revolutionary Guards directed to carry out unconventional warfare and intelligence activities and responsible for extraterritorial operations. They support non-state actors in many foreign countries that include Lebanese Hezbollah, Hamas and Palestinian Islamic Jihad in the Gaza Strip and the West Bank, Yemeni Houthis, and Shia militias in Iraq, Syria, and Afghanistan. The United States has designated the Quds Force a supporter of terrorism since 2007.

60.    According to U.S. State Department's Iran Action Group, Iran has spent $16 billion on supporting terrorist groups in the region since 2012.[21] Given various institutions in Iran who work on soft war against the west and networking with fundamentalist groups worldwide, it is fair to say that Iran is now spending more than $5 billion dollars a year on cultural and soft war which should be categorized under its support to terrorism.

### III.    CONCLUSION AND OPINIONS

61.    It is my opinion that the activities alleged in Mr. Abedini's complaint are consistent with a pattern and practice of behavior undertaken by the Iranian government towards Iranian-American dual citizens, particularly active during the time period of the complaint, in

---

[21] Iran Action Group, U.S. Dept. of State, *Outlaw Regime: A Chronicle of Iran's Destructive Activities*, (September 25, 2018), https://www.state.gov/documents/organization/286410.pdf.

which illegal actions were directed against such dual citizens, in part to give Iran greater leverage against the United States and to enable it to accomplish its political and other goals.

62.     It is my further opinion that the Iranian government aimed to use Mr. Abedini and other Iranian-Americans detained during the same period as leverage in bilateral U.S.-Iranian negotiations and to obtain concessions from the United States. The timing of Mr. Abedini's detention and release supports this conclusion, as do statements made by prominent members of the Iranian government. For example, on January 20, 2016, Mohammad Reza Naqdi, Ayatollah Khamenei's appointee as IRGC's deputy and former chief of Basij militia, stated that the United States bought the freedom of its "spies" by releasing $1.7 billion of Iran's frozen assets. Naqdi claimed that the release of Iran's funds did not have anything to do with the negotiations and only became possible by taking Iranian-Americans as hostages: "The annulment of sanctions Against Iran's Bank Sepah and reclaiming of $1.7 [billion] of Iran's frozen assets after 36 years showed that the U.S. doesn't understand anything but the language of force," he said.

63.     It is my further opinion that the conduct alleged in Mr. Abedini's complaint, including illegal detention, abuse by government officials to obtain confession, and unauthorized solitary confinement for a long period, violates Iranian law as I have outlined it above.

64.     It is my further opinion that detentions described above were undertaken at the direction, and with the active participation, of the Iranian government. Given the frequency and similar characteristics, the use of justice mechanisms controlled by the state to carry them out, and the control the regime exerts over such matters, there is no reasonable possibility that these acts occurred without the direction, participation, and approval of the Iranian government.

65.     It is my further opinion that the Iranian government will continue to engage in a practice of illegally imprisoning, abusing and torturing dual citizens (to get what it wants from

the United States or others), unless it is adequately deterred; as demonstrated by the 2015 and

2016 arrests and convictions of Siamak and Bagher Namazi, 2016 arrest and conviction of Reza

Shahini, as well as Nazanin Zaghari-Ratcliffe (Iranian-British dual citizen), and dozens of other

cases, Iran has not yet been deterred from this practice.

66.     It is further my opinion that considering the factors inherent in awarding punitive

damages, that of punishment and deterrence, it is noted that Iran has not decreased its support for

terrorism, but has dramatically increased and widened its support for terrorists, terrorist

organizations and terrorist activities throughout the world. Punishment can be measured, in large

part, in assessing significant financial damages for the continued and expanded wide-ranging

world-wide support for terrorism supported by the Islamic Republic of Iran and its governmental

arms. Iran is blatant in its support of terrorism. As to deterrence, there are two factors to

consider: deterring such conduct by others, and making further efforts to deter Iran in its bold

and increasing support for terrorism, which Iran uses to expand its influence, its reach and its

force by terrorist means, which should not be countenanced by this Court.

67.     It is further my opinion, considering the material increase of financial and other

support provided by Iran in blatant support of terrorism throughout the world, targeting

Americans and others, the United States court system, in its pursuit of justice for victims of

terrorism, should send the most powerful message possible on behalf of American victims of

Iranian supported terrorism as a most important tool, in an effort to dissuade Iran, and other state

sponsors of terrorism, from continuing their acts and sponsorship of terrorism. Accordingly, in

my opinion, this Court should continue to send the strongest possible message within its means

and procedures, including the assessment of significant punitive damages, that state sponsors of

terrorism, such as the Islamic Republic of Iran, will be held fully accountable for their heinous

acts.

I declare under penalty of perjury under the laws of the United States of America that the

forgoing is true and correct.

Mehdi Khalaji

# EXHIBIT A

4802 Foxhall Crescent NW, Washington, DC 20007 (cell phone): 202 360-1518
mkhalaji@washingtoninstitute.org

**Professional Experience**

**Washington Institute for Near East Policy,**          **August 2005-Present Washington, DC**

Senior Fellow • Author of Policy Watches, Op-Ed articles and many similar published monographs on the subjects of Iranian domestic and foreign politics and the Shiite Clerical Establishment in the Middle East

•Consultant to U.S. government, as well as European, Canadian, Australian, and Asian diplomats on issues related to Iran and the Shiite community of the Middle East
•Contributor to major U.S. newspapers such as, the Washington Post, the New York Times, and the Wall Street Journal, and international newspapers such as Guardian, and Le Figaro
 •Contributor to U.S. and Iranian periodicals such as Current Trends in Islamic Ideology and Iran Nameh

**SAIS, 2013-2014 Washington, DC**

Lecturer

**Radio Free Europe/Radio Liberty          January 2002-May 2005 Prague, Czech Republic** Radio Broadcaster • Conducted interviews and roundtable discussions with Iranian and foreign experts and officials on the topics of Iranian domestic and foreign policy and diplomacy

•Hosted a live one-hour radio broadcast from • Produced over 30 feature segments on Iranian domestic policy and diplomacy, Middle East crises, Islamic world cultural and political challenges, and the war in Iraq
•Provided translation from English, Arabic, and French, to Persian • Appointed team-leader, as representative to the RFE/RL Board of Religion and Tolerance • Wrote and edited broadcast reports daily

**BBC**                                   **September 2000-December2001  Paris,France,**
Radio Broadcaster • Produced daily analysis of Iranian current affairs and Islamic world issues •
Wrote hundreds of online articles on Iranian domestic policy and diplomacy, Islamic
fundamentalism, and Middle East crises • Produced a feature on the clerical institution after the
Iranian revolution and its political development

**Entekhab Daily, 1998-2000 Tehran, Iran**

Member of Editorial Board•
Director of cultural editorial board
•Advisor to editor-in-chief • Wrote dozens of articles and editorials on Iranian political affairs
and Islamic world issues

**Education**

**Ecole Pratique Des Hautes Etudes University of Sorbonne** - Paris, France Doctorate
Degree: Shiite Exegesis and Theology, 2004

**University of Tarbiat Modarres** – Qom, Iran Masters Degree: Western Philosophy,
2000 Seminary – Qom Iran
PhD(Equivalent): Shiite Theology, Law and Exegesis, 2000

# EXHIBIT B

## M. Khalaji's List of Publications and Speeches

- Patrick Clawson & Mehdi Khalaji, *How Iranians Might React to a Nuclear Deal*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/how-iranians-might-react-to-a-nuclear-deal (Sept. 2014).

- Mehdi Khalaji, *Ailing Official Highlights; Concentration of Power in Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ill-official-highlights-concentration-of-power-in-iran (June 11, 2014).

- Mehdi Khalaji, *Tightening the Reins*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/tightening-the-reins-how-khamenei-makes-decisions (April 2014).

- Nima Gerami & Mehdi Khalaji, *Iran's Nuclear Debate: The Domestic Politics*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/irans-nuclear-debate-the-domestic-politics (Feb. 26, 2014).

- Mehdi Khalaji, *Ayatollah Khamenei: Pessimistic Negotiator, Optimistic Strategist*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-nuclear-debate-the-domestic-politics (Feb. 21, 2014).

- Mehdi Khalaji, *Salafism as a National Security Threat for Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/salafism- as-a-national-security-threat-for-iran (Feb. 20, 2014).

- Mehdi Khalaji, *President Rouhani and the IRGC*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/president-rouhani-and-the-irgc (Jan. 8, 2014).

- Mehdi Khalaji, *Iran's Leaders Emphasize Limitations of the Nuclear Agreement*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-leaders-emphasize-limitations-of-the-nuclear-agreement (Nov. 25, 2013).

- Patrick Clawson & Mehdi Khalaji, *Iranian Consensus Does Not Necessarily Mean a Good Deal for the West*, The Washington Post, *available at* http://www.washingtonpost.com/opinions/iran-is-unlikely-to-take-the-path-the-west-hopes-it-will/2013/11/12/2eb713be-4b27-11e3-be6b-d3d28122e6d4_story.html (Nov. 12, 2013).

- Mehdi Khalaji, *The Rise of Persian Salafism*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-rise-of-persian-salafism (Oct. 3, 2013).

- Mehdi Khalaji, *Unexpected Iranian Dispute on Syria*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/unexpected-iranian-dispute-on-syria (Sept. 4, 2013).

- Mehdi Khalaji, Syria as a Spoiler in Iran's Foreign Policy, The Washington Institute, available at http://www.washingtoninstitute.org/policy-analysis/view/syria-as-a-spoiler- in-irans-foreign-policy (Aug. 27, 2013).

- Mehdi Khalaji, *Iran's Next Cabinet: Technocratic and Security Focused*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-next-cabinet-technocratic-and-security-focused (July 30, 2013).

- Mehdi Khalaji, *Iran's Losing Bet in Egypt*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-losing-bet-in-egypt (July 8, 2013).

- Mehdi Khalaji, *The Rowhani Front*, Project Syndicate, *available at* https://www.project- syndicate.org/commentary/change-in-iran-under-hassan-rowhani-by-mehdi-khalaji (June 19, 2013).

- Mehdi Khalaji, *Did Sanctions Shape the Iranian Election*, The Washington Post, *available at* http://www.washingtonpost.com/opinions/mehdi-khalaji-did-sanctions- shape-the-iranian-election/2013/06/17/dd8a9140-d77d-11e2-a9f2-42ee3912ae0e_story.html (June 17, 2013).

- Saeid Golkar & Mehdi Khalaji, *The Islamic Republic's Will to Survive: Likely Nuclear Resistance, Unlikely Social Revolt*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-islamic-republics-will-to- survive-likely-nuclear-resistance-unlikely-so (June 12, 2013).

- Mehdi Khalaji et al., *The Iran Primer: Power, Politics, and U.S. Policy*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-iran- primer-power-politics-and-u.s.-policy (June 3, 2013).

- Mehdi Khalaji, *Winners and Losers in Iran's Presidential Election*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/winners- and-losers-in-irans-presidential-election (May 24, 2013).

- Mehdi Khalaji, *After Ahmadinejad*, Project Syndicate, *available at* http://www.project- syndicate.org/commentary/the-presidential-succession-struggle-in-iran-by-mehdi-khalaji (May 22, 2013).

- Mehdi Khalaji, *Tehran to Decide Who Can Run for President*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/tehran-to-decide- who-can-run-for-president (May 7, 2013).

- Mehdi Khalaji, *Iran's Crisis of State Ideology*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-crisis-of-state-

ideology (April 19, 2013).

- Michael Eisenstadt & Mehdi Khalaji, *Forget the Fatwa*, The National Interest, *available at* http://nationalinterest.org/commentary/forget-the-fatwa-8220 (March 14, 2013).

- Mehdi Khalaji, *Déjà vu in Cairo*, The Majalla, *available at* http://www.majalla.com/eng/2013/03/article55238786 (March 1, 2013).

- Mehdi Khalaji, *The Enduring Egypt-Iran Divide*, Project Syndicate, *available at* https://www.project-syndicate.org/commentary/prospects-and-challenges-of-an-iran- egypt-rapprochement-by-mehdi-khalaji (Dec. 31, 2012).

- Mehdi Khalaji, *Through Khamenei's Eyes: Ayatollah Ali Khamenei's Unique Take on the Uprisings in the Arab World*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-and-the-policy-of-creating- crises-..-from-saddam-to-bashar (Oct. 2012).

- Mehdi Khalaji, *Khamenei's Strategy for Obama's Second Term*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/khameneis-strategy-for-obamas-second-term (Nov. 14, 2012).

- Mehdi Khalaji, *Shiite Clergy's Silence Toward Syrian Crisis*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/shiite-clergys- silence-toward-syrian-crisis (Nov. 5, 2012).

- Mehdi Khalaji, *Is Ahmadinejad the Scapegoat for Iran's Economy?*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/shiite- clergys-silence-toward-syrian-crisis (Oct. 4, 2012).

- Mehdi Khalaji, *Iran's Electoral Strategy*, Project Syndicate, *available at* http://www.project-syndicate.org/commentary/iran-s-electoral-strategy-by-mehdi-

khalaji (Sept. 12, 2012).

- Mehdi Khalaji, *Iran's Confidence Bolstered by Non-Aligned Summi*t, Project Syndicate, *available* at http://www.washingtoninstitute.org/policy-analysis/view/irans-confidence- bolstered-by-non-aligned-summit (Aug. 27, 2012).

- Mehdi Khalaji, *Sharp Contrast between U.S. and Iranian Earthquake Responses,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/sharp-contrast-between-u.s.-and-iranian-earthquake-responses (Aug. 13, 2012).

- Mehdi Khalaji. *Iran and the Human Rights Opening,* Wall Street Journal, *available* at http://online.wsj.com/news/articles/SB10000872396390443659204577574791354147490 (Aug. 8, 2012).

- Mehdi Khalaji, *The Clerics vs. Modernity: Failure of the Islamic Republic's Soft Power,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/the-clerics-vs.-modernity-failure-of-the-islamic-republics-soft-power (June 2012).

- Mehdi Khalaji, *The Taboo Buried in Beheshti's Coffin,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-taboo-buried- in-mohammad-beheshtis-coffin (June 27, 2012).

- Patrick Clawson and Mehdi Khalaji, *Iran Confident As Sanctions Tighten,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/iran-confident-as-sanctions-tighten (June 26, 2012).

- Mehdi Khalaji, *The Clerics vs. Modernity,* The Majalla, *available at* http://www.majalla.com/eng/2012/05/article55232092 (May 23, 2012).

- Patrick Clawson and Mehdi Khalaji, *Prospects for Success in the Iran Nuclear Negotiations.* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/prospects-for-success-in-the- iran-nuclear-negotiations (May 18, 2012).

- Mehdi Khalaji, *The Ayatollah of Rejection May Be Contemplating Compromise,* The Daily Star, *available at* http://www.dailystar.com.lb/Opinion/Commentary/2012/May- 12/173156-the-ayatollah-of-rejection-may-be-contemplating- compromise.ashx#axzz3D7K03BsT (May 12, 2012).

- Mehdi Khalaji, *The Ayatollah Contemplates Compromise,* The Project Syndicate, *available at* http://www.project-syndicate.org/commentary/the-ayatollah-contemplates- compromise (May 9, 2012).

- Mehdi Khalaji, *The Future of the Marjayia,* The Majalla, *available at* http://www.majalla.com/eng/2012/04/article55230371 (April 3, 2012).

- Mehdi Khalaji, *Iran Keeps Compromise Option Open,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-keeps- compromise-option-open (March 22, 2012).

- Mehdi Khalaji, *Khamenei's Strength Could Be a Vulnerability*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/khameneis- strength-could-be-a-vulnerability (March 12, 2012).

- Mehdi Khalaji, *No Nuclear Compromise*, The Majalla, *available at* http://www.majalla.com/eng/2012/03/article55229790 (March 7, 2012).

- Mehdi Khalaji, Karim Sadjadpour, & Dennis Ross, *Who Will Lead Post-Khamenei*

*Iran?*, The Washington Institute, *available at*
http://www.washingtoninstitute.org/policy- analysis/view/who-will-lead-post-khamenei-iran (Feb. 12, 2012).

- Mehdi Khalaji, *It's Time to Bypass Iran's 'Supreme Leader'*, The Wall Street Journal, *available at*
http://online.wsj.com/news/articles/SB10001424052970204369404577206973232126642 (Feb. 9, 2012).

- Mehdi Khalaji, *Supreme Succession: Who Will Lead Post-Khamenei Iran?*. The Washington Institute, *available at*
http://www.washingtoninstitute.org/policy- analysis/view/supreme-succession-who-will-lead-post-khamenei-iran (Feb. 2012).

- Mehdi Khalaji, *Iran's Regime of Religion*, 65 Colum. J. Int'l Affairs 131 (Dec. 1, 2011).

- Mehdi Khalaji, *Give Iran Good Television*, PBS Frontline, *available at*
http://www.pbs.org/wgbh/pages/frontline/tehranbureau/2011/12/comment-how-to-fix- voas-persian-service-get-rid-of-it.html (Dec. 12, 2011).

- Mehdi Khalaji, *Iran's Rattling Saber,* Project Syndicate, Project Syndicate, *available at*
http://www.project-syndicate.org/commentary/iran-s-rattling-saber (Nov. 30, 2011).

- Mehdi Khalaji, *The Current State of Iranian Affairs: A Candid Discussion*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-current-state-of-iranian-affairs-a-candid-discussion (Nov. 15, 2011).

- Mehdi Khalaji, *The Domestic Logic of Iran's Foreign Plots,* The Washington Institute, *available at* https://www.project-syndicate.org/commentary/the-domestic-logic-of-iran-s- foreign-plots (Nov. 1, 2011).

- Michael Eisenstadt & Mehdi Khalaji, *Nuclear Fatwa: Religion and Politics in Iran's Proliferation Strategy,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/nuclear-fatwa-religion-and- politics-in-irans-proliferation-strategy3 (Sept. 27, 2011).

- Mehdi Khalaji, *Axis of Abuse: U.S. Human Rights Policy toward Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/axis-of- abuse-u.s.-human-rights-policy-toward-iran (Sept. 22, 2011).

- Michael Eisenstadt & Mehdi Khalaji, *Nuclear Fatwa: Religion and Politics in Iran's Proliferation Strategy,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/nuclear-fatwa-religion-and- politics-in-irans-proliferation-strategy3 (Sept. 2011).

- Mehdi Khalaji, *Iran's Policy Confusion about Bahrain,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-policy- confusion-about-bahrain (June 27 2011).

- Mehdi Khalaji, *Supreme Succession*, The Majalla, *available at* http://www.majalla.com/eng/2011/06/article3673 (June 13, 2011).

- Mehdi Khalaji, *Iran and Syria, Aljazeera Network,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-and-syria (June 9, 2011).

- Mehdi Khalaji, *The Ayatollah Will Overwhelm Ahmadinejad,* CNN.com, *at* http://globalpublicsquare.blogs.cnn.com/2011/06/01/the-ayatollah-will-beat- ahmadinejad/ (June 1, 2011).

- Mehdi Khalaji, *Iran's Continuing Power Struggles,* The Washington Institute,

*available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-continuing-power- struggles (April 20, 2011).

- Mehdi Khalaji, *Influence Curtailed: Democracy in the Arab World Stands to Strip Iran of Its Power,* The Majalla, *available at* http://www.majalla.com/eng/2011/04/article999 (April 12, 2011).

- Jean-Pierre Filiu & Mehdi Khalaji, *The Muslim Brotherhood Today: Between Ideology and Democracy,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-muslim-brotherhood-today- between-ideology-and-democracy (March 24, 2011).

- Patrick Clawson & Mehdi Khalaji, *Implementing Obama's Message Supporting Iranian Human Rights,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/implementing-obamas-message-supporting-iranian-human-rights (March 21, 2011).

- Mehdi Khalaji, *Iran's Political Super Bowl: Ahmadinezhad vs. Rafsanjani,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans-political-super-bowl-ahmadinezhad-vs.-rafsanjani (March 4, 2011).

- Mehdi Khalaji, *Iran's Supreme Power Struggle,* Project Syndicate, *available at*   https://www.project-syndicate.org/commentary/iran-s-supreme-power-struggle (December 16, 2010).

- Mehdi Khalaji, *Internal Divisions among Iranian Hardliners Come to the Fore,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/internal-divisions-among-iranian-hardliners-come-to-the-fore (Aug. 12, 2010).

- Mehdi Khalaji, *One Year after a Rigged Election: Iran's Introverted Politics,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/one-year-after-a-rigged-election-irans-introverted-politics (June 9, 2010).

- Mehdi Khalaji, *Getting the Message Across: Better Broadcasting to Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/getting-the-message-across-better-broadcasting-to-iran (April 27, 2010).

- Mehdi Khalaji, *Setback for Iran's Opposition: Khamenei's Hardline Reinforced,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/setback-for-irans-opposition-khameneis-hardline-reinforced (Feb. 12, 2010).

- David Cvach, Ali Alfoneh, & Mehdi Khalaji, *How to Assess Political Fissures in Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/how-to-assess-political-fissures-in-iran (Feb. 10, 2010).

- Mehdi Khalaji, *Khamenei and the Politics of Indecision,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/khamenei-and-the- politics-of-indecision (Feb. 10, 2010).

- Mehdi Khalaji & J. Scott Carpenter, *America and the Iranian Political Reform Movement: First, Do No Harm,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/america-and-the-iranian- political-reform-movement-first-do-no-harm (Feb. 3, 2010).

- Mehdi Khalaji, *Statement on the Arrest of Ayatollah Mohammad Taqi Khalaji in Iran,* The Washington Institute, *available at*

*http://www.washingtoninstitute.org/policy- analysis/view/statement-on-the-arrest-of-ayatollah-mohammad-taqi-khalaji-in-iran* (Jan. 14, 2010).

- Mehdi Khalaji, *Islam vs. Iran's Islamic Republic,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/islam-vs.-irans-islamic-republic (Dec. 18, 2009).

- Patrick Clawson & Mehdi Khalaji, *Determining the Effectiveness of Sanctions on Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/determining-the-effectiveness-of-sanctions-on-iran (Oct. 1, 2009).

- Stephen P. Rosen & Mehdi Khalaji, *Inside Iranian Politics and Nuclear Strategy*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/inside-iranian-politics-and-nuclear-strategy-a-g-20-briefing (Sept. 24, 2009).

- Mehdi Khalaji & Patrick Clawson, *Quds Day in Iran: Velvet Revolution Trumps Nuclear Negotiations* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/quds-day-in-iran-velvet-revolution-trumps-nuclear-negotiations (Sept. 17, 2009).

- Mehdi Khalaji, *Ahmadinezhad's Cabinet: Loyalists and Radicals*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhads-cabinet-loyalists-and-radicals (Aug. 21, 2009).

- Mehdi Khalaji, *Militarization of the Iranian Judiciary,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/militarization-of- the-iranian-judiciary (Aug. 13, 2009).

- Mehdi Khalaji, *An Interview with Mehdi Khalaji,* The Washington Institute, *available*

*at* http://www.washingtoninstitute.org/policy-analysis/view/an-interview-with-mehdi- khalaji (June 27 2009).

- Mehdi Khalaji, *Shiite Clerical Establishment Supports Khamenei,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/shiite- clerical-establishment-supports-khamenei (July 8, 2009).

- Mehdi Khalaji & Michael Singh, *Iran at a Crossroads?*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-at-a-crossroads (June 24, 2009).

- Mehdi Khalaji et al., *Iran's 'Election': What Happened? What Does It Mean?*. The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/irans-election-what-happened-what-does-it-mean (June 18, 2009).

- Mehdi Khalaji et al., *The Iranian Elections: Politics of the Supreme Leader vs. Power of the President,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-at-a-crossroads (June 12, 2009).

- Mehdi Khalaji, *The Voting Manipulation Industry in Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-voting- manipulation-industry-in-iran (June 10, 2009).

- Mehdi Khalaji, *House of the Leader: The Real Power in Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/house-of-the- leader-the-real-power-in-iran (June 1, 2009).

- Mehdi Khalaji, *Egypt's Muslim Brotherhood and Iran,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/egypts-

muslim- brotherhood-and-iran (Feb. 12, 2009).

- Mehdi Khalaji, *Iran Says Much, Does Little on Gaza*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/iran-says-much- does-little-on-gaza (Jan. 8, 2009).

- Jean-Pierre Filiu & Mehdi Khalaji, *The Rise of Apocalyptic Islam: Causes and Implications* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-rise-of-apocalyptic-islam- causes-and-implications (Nov. 13, 2008).

- Mehdi Khalaji, *The Problems of Engaging with Iran's Supreme Leader*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the- problems-of-engaging-with-irans-supreme-leader (Nov. 12, 2008).

- Mehdi Khalaji, *Ahmadinezhad Deflects Criticism with Attacks on Clerics*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhad-deflects-critcism-with-attacks-on-clerics (June 11, 2008).

- Mehdi Khalaji, *Treatment of Bahais: A Test of Human Rights in Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhad-deflects-critcism-with-attacks-on-clerics (June 4, 2008).

- Mehdi Khalaji, *Kuwaiti Elections: Democracy in Action, or Inaction?*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/kuwaiti- elections-democracy-in-action-or-inaction (May 16, 2008).

- Mehdi Khalaji, *Iranian Parliamentary Elections and Ahmadinezhad's Discontents*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-

analysis/view/iranian-parliamentary-elections-and-ahmadinezhads-discontents (April 22, 2008).

- Mehdi Khalaji, *Iran's Parliamentary Elections: Assured Victory for the Supreme Leader*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/irans-parliamentary-elections-assured-victory-for-the-supreme-leader (Feb. 19, 2008).

- Mehdi Khalaji, *Domestic Issues Trump Foreign Policy in Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/domestic-issues- trump-foreign-policy-in-iran (Jan. 18, 2008).

- Mehdi Khalaji, *Apocalyptic Politics: On the Rationality of Iranian Policy*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/apocalyptic-politics-on-the-rationality-of-iranian-policy (Jan. 2008).

- Mehdi Khalaji, *Larijani's Resignation: Implications for Iranian Nuclear Policy and Internal Politics*, The Washington Institute, *available at* https://www.washingtoninstitute.org/policy-analysis/view/larijanis-resignation-implications-for-iranian-nuclear-policy-and-internal- (October 25, 2017)

- Patrick Clawson & Mehdi Khalaji, *Ahmadinezhad's Power Slipping in Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/ahmadinezhads-power-slipping-in-iran (Sept. 6, 2007).

- Mehdi Khalaji, *Iran's Revolutionary Guards Corps, Inc.*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/irans- revolutionary-guards-corps-inc (Aug. 17, 2007).

- Patrick Clawson & Mehdi Khalaji, *How Supreme Is Iran's Supreme Leader?*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/how-supreme-is-irans-supreme-leader (July 23, 2007).

- Mehdi Khalaji, *U.S. Support for the Iranian Opposition*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/how-supreme-is- irans-supreme-leader (July 9, 2007).

- Mehdi Khalaji, *Bad Veils' and Arrested Scholars: Iran's Fear of a Velvet Revolution*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/bad-veils-and-arrested-scholars-irans-fear-of-a-velvet-revolution (May 24, 2007).

- Mehdi Khalaji & Neil Crompton, *Understanding Iranian Intentions and Capabilities*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy- analysis/view/understanding-iranian-intentions-and-capabilities (May 11, 2007).

- Mehdi Khalaji, *Through the Veil: The Role of Broadcasting in U.S. Public Diplomacy Toward Iranians*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/through-the-veil-the-role-of- broadcasting-in-u.s.-public-diplomacy-toward-i (April 2007).

- Mehdi Khalaji, *The British Naval Detainees and Iranian Public Opinion*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-british-naval-detainees-and-iranian-public-opinion (April 10, 2007).

- Mehdi Khalaji, *Iran Feels the Heat: International Pressure Emboldens Tehran's Domestic Critics*, The Washington Institute, *available at*

http://www.washingtoninstitute.org/policy-analysis/view/iran-feels-the-heat-international-pressure-emboldens-tehrans-domestic-criti (Jan. 18, 2007).

- Robert Satloff, Dennis Ross, & Mehdi Khalaji, *The Iraq Study Group: Assessing Its Regional Conclusions*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-iraq-study-group-assessing- its-regional-conclusions (Dec. 21, 2006).

- Mehdi Khalaji, *The Significance of Iran's December Elections*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-iraq-study- group-assessing-its-regional-conclusions (Dec. 11, 2006).

- Mehdi Khalaji, *Iranian President Ahmadinezhad's Relations with Supreme Leader Khamenei*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-iraq-study-group-assessing- its-regional-conclusions (Sept. 12, 2006).

- Mehdi Khalaji, *The Last Marja: Sistani and the End of Traditional Religious Authority in Shiism*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/the-last-marja-sistani-and-the- end-of-traditional-religious-authority-in-sh (Sept. 2006).

- Mehdi Khalaji, *Ahmadinezhad's Popularity One Year On,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhads- popularity-one-year-on (July 20, 2006).

- Mehdi Khalaji, *Iran's Shadow Government in Lebanon*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhads- popularity-one-year-on (July 19, 2006).

- Mehdi Khalaji, *International Pressure and Internal Conflict,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-

16

analysis/view/ahmadinezhads- popularity-one-year-on (May 24, 2006).

- Mehdi Khalaji, *Perils and Promise of U.S.-Iranian Negotiations*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/ahmadinezhads-popularity-one-year-on (May 10, 2006).

- Mehdi Khalaji, *Miscommunication between Iranian Society and the West on Iran's Nuclear Program*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/miscommunication-between- iranian-society-and-the-west-on-irans-nuclear-prog (February 10, 2006).

- Mehdi Khalaji, *Religious Authority in Iraq and the Election*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/religious-authority- in-iraq-and-the-election (Dec. 14, 2005).

- Mehdi Khalaji, *Tehran's Renewed War on Culture,* The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/tehrans-renewed-war-on- culture (Nov. 21, 2005).

- Mehdi Khalaji, *Creating Effective International Pressure for Human Rights in Iran*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/tehrans-renewed-war-on-culture (Oct. 26, 2005).

- Mehdi Khalaji & Mohsen Sazegara, *Challenges Facing Iran's New Government*, The Washington Institute, *available at* http://www.washingtoninstitute.org/policy-analysis/view/tehrans-renewed-war-on-culture (Aug. 11, 2005).

# EXHIBIT C

# Saeed Abedinigalangashi v. Islamic Republic of Iran, Working Group on Arbitrary Detention, Opinion No. 18/2013, U.N. Doc. A/HRC/WGAD/2013/18 (2014).

A/HRC/WGAD/2013/18

Distr.: General

14 January 2014

Original: English

General Assembly

Human Rights Council
Working Group on Arbitrary Detention

Opinions adopted by the Working Group on Arbitrary Detention at its sixty-seventh session, 26–30 August 2013

No. 18/2013 (Islamic Republic of Iran)

Communication addressed to the Government on 21 June 2013

Concerning Saeed Abedinigalangashi

The Government has not replied to the communication.

The State is a party to the International Covenant on Civil and Political Rights.

1. The Working Group on Arbitrary Detention was established in resolution 1991/42 of the former Commission on Human Rights, which extended and clarified the Working Group's mandate in its resolution 1997/50. The Human Rights Council assumed the mandate in its decision 2006/102 and extended it for a three-year period in its resolution15/18 of 30 September 2010. In accordance with its methods of work (A/HRC/16/47, annex, and Corr.1), the Working Group transmitted the above-mentioned communication to the Government.

2. The Working Group regards deprivation of liberty as arbitrary in the following cases:

(a) When it is clearly impossible to invoke any legal basis justifying the deprivation of liberty (as when a person is kept in detention after the completion of his or her sentence or despite an amnesty law applicable to the detainee) (category I);

(b) When the deprivation of liberty results from the exercise of the rights or freedoms guaranteed by articles 7, 13, 14, 18, 19, 20 and 21 of the Universal Declaration of Human Rights and, insofar as States parties are concerned, by articles 12, 18, 19, 21, 22, 25, 26 and 27 of the International Covenant on Civil and Political Rights (category II);

(c) When the total or partial non-observance of the international norms relating to the right to a fair trial, established in the Universal Declaration of Human Rights and in the relevant international instruments accepted by the States concerned, is of such gravity as to give the deprivation of liberty an arbitrary character (category III);

(d) When asylum seekers, immigrants or refugees are subjected to prolonged administrative custody without the possibility of administrative or judicial review or remedy (category IV);

(e) When the deprivation of liberty constitutes a violation of international law for reasons of discrimination based on birth; national, ethnic or social origin; language; religion; economic condition; political or other opinion; gender; sexual orientation; or disability or other status, and which aims towards or can result in ignoring the equality of human rights (category V).

Submissions

Communication from the source

3. Saeed Abedinigalangashi (hereinafter Mr. Abedini), 33 years of age, a dual national of the Islamic Republic of Iran and the United States of America, is a Christian pastor with residence in Boise, Idaho, United States of America.

4. On 28 July 2012, during a visit to Tehran to visit family and to finalize arrangements for an orphanage he was building in Rasht, Islamic Republic of Iran, Mr. Abedini was taken off a bus at the border between Turkey and the Islamic Republic of Iran as he was lawfully entering the country. The bus was stopped by individuals who reportedly identified themselves as members of the Iranian Revolutionary Guard Corps. The source reports that the Revolutionary Guard Corps detained Mr. Abedini, informing him that he must face criminal charges because of his Christian faith. After intense interrogations, Mr. Abedini was placed under house arrest at his parents' home in Tehran. He was told to wait for a court summons.

5. On 26 September 2012, Mr. Abedini received a summons informing him where to make an appearance. Five members of the Revolutionary Guard Corps reportedly raided his parents' home in Tehran and confiscated many of his belongings. They instructed Mr. Abedini to pack a bag, then proceeded to take him to an unknown location. After four days with no information on his whereabouts, Mr. Abedini's family was informed by the Revolutionary Guard Corps that he was being held in solitary confinement in Evin Prison.

6. Reportedly, no arrest warrant was shown to Mr. Abedini when he was arrested on 28 July 2012. During the 26 September 2012 arrest, a warrant was shown but the arresting authorities refused to provide Mr. Abedini's family with a copy. The family was not given enough time to inspect the warrant to ascertain who the issuing authority was.

7. Regarding the reasons for the arrest, Mr. Abedini was informed that he had attempted to undermine the national security of the country (known as "eghdam alayhe amniate meli" in Farsi) by holding Christian worship services in private homes. The authorities also stated that by expressing his faith (including sharing his faith with others in a non-coercive manner), baptising fellow Christian believers and holding religious meetings outside of the Islamic Republic of Iran, Mr. Abedini had attempted to undermine national security. Mr. Abedini was sentenced to eight years in prison under the oversight of the Iranian Prisons Organization.

8. The source reports that Mr. Abedini's initial arrest without a warrant was solely for the exercise of his fundamental freedoms. Additionally, he was denied access to his lawyer until less than 24 hours before his trial. He finally appeared before a judge on 21 January 2013 to present his defence. Mr. Abedini and his lawyer argued that his intention in gathering with Christian believers was motivated solely by his faith and that he had no intention to undermine the Government. The judge presiding in court allegedly requested Mr. Abedini's lawyer to go to the media and inform them that the trial was being conducted

fairly and that Mr. Abedini would be released on bail soon. However, Mr. Abedini's family repeatedly sought bail and their requests were never granted.

9. During the week of his trial, Mr. Abedini was transferred from Ward 209 to Section 3 of Ward 350 at the request of his lawyer. In Ward 209 Mr. Abedini had been denied medical treatment relating to infections that allegedly had resulted from several beatings. The ward doctor and nurse allegedly refused to treat him because as a Christian he was considered "unclean and an infidel". Mr. Abedini's family in Tehran was allowed to visit him on Mondays but he was not permitted to make telephone

calls, which prevented him from contacting his wife and two young children in the United States.

10. On the second day of Mr. Abedini's trial, he and his lawyer were reportedly barred from the courtroom while the witnesses, including acquaintances and lay ministers (religious leaders), were questioned. One witness was reportedly asked about his association with Mr. Abedini, the current status of Christian churches, the individual's conversion to Christianity and how Mr. Abedini funded his travels and the orphanage he was building.

11. On 27 January 2013, one week after Mr. Abedini had presented his defence, he was convicted and sentenced. The court relied heavily on his activities with the Christian house churches between 2000 and 2005. A written verdict was reportedly not issued and Mr. Abedini's lawyer was told that he had 20 days to appeal the verdict.

12. On 4 February 2013, Mr. Abedini's lawyer filed an appeal against the conviction and sentence. In early April 2013, Mr. Abedini's appeal was sent to Branch 36 of the Revolutionary Courts. According to the source, the decision to send the appeal to Branch 36 — one of two appeal branches to which Mr. Abedini's case could have been sent (the other being Branch 54) — signified that the authorities were allegedly not willing to give the case an impartial review. The source alleges that judges of Branch 36 are known to rubber-stamp decisions and follow directions given by higher authorities. On Sunday, 7 April 2013, Mr. Abedini's lawyer again attempted to get him released on bail but his efforts were unsuccessful.

13. The source raises concerns regarding Mr.Abedini's welfare and security. Reportedly, he has been beaten and threatened due to his Christian faith. In a letter written on 10 January 2013, Mr. Abedini stated that he had been told that he would be hanged for his faith in Jesus. He also reported that he had received various death threats from his prison cellmates, who have allegedly threatened to kill him during his sleep.

14. In late February 2013, it became known that Mr. Abedini was suffering from internal bleeding, an injury resulting from physical beatings he reportedly endured during his interrogations. Mr. Abedini was said to have been examined by doctors in early March 2013, at which time it was determined that his injuries warranted immediate medical attention and that he needed to be transferred to a hospital outside the prison for treatment. According to the source, the authorities ignored this medical emergency for over a month.

15. The source reports that, in an attempt to appease international pressure relating to his case, prison officials took Mr. Abedini to a private hospital in Tehran on 8 April 2013. Before doing so, however, several guards forced Mr. Abedini to change his prison uniform and to put on a uniform that was normally issued to prisoners convicted of murder. When Mr. Abedini resisted, the prison guards reportedly physically abused him, beating him and kicking him in the stomach and exacerbating the internal bleeding he suffered. They stripped Mr. Abedini down and forced him to wear the offending uniform. When Mr. Abedini arrived at the hospital, he was reportedly paraded around the facilities and was not admitted or treated because, according to the guards, no doctors or staff were present. Mr. Abedini was then returned to prison without being given the medical treatment he required.

16. Mr. Abedini was allegedly recently placed in solitary confinement for 10 days. Before being taken to solitary confinement, he complained of pain in his kidneys. He and several other prisoners in Ward 350 wrote a letter to prison officials in peaceful protest of their lack of access to medical care. In response to the letter, the Iranian officials reportedly chose 10 prisoners to place in solitary confinement, Mr. Abedini among them. Although Mr. Abedini was returned to the general prison population, he is still being denied necessary life-saving medical treatment.

17. In the light of the alleged human rights violations suffered by Mr. Abedini, the source submits that the Iranian Constitution provides protection for religious minorities and that it also prohibits the Government from punishing an individual for simply holding a certain religious belief, stating that "the investigation of individuals' beliefs is forbidden and no one may be molested or taken to task simply for holding a certain belief". Moreover, article 38 states: "Any kind of torture used to extract an admission of guilt or to obtain information is forbidden. Compelling people to give evidence, or confess or take an oath is not allowed. Such evidence or confession or oath is null and void."

18. The source further points out that the International Covenant on Civil and Political Rights states, in paragraph 9, that "everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention." The Covenant also identifies a number of procedural rights to which the accused is entitled, including the right to have adequate time and facilities for the preparation of his defence, and to be tried in his presence (art. 14). Most importantly, the Covenant guarantees, in article 14, that "all persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law...Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law."

19. The source submits that the Covenant also provides, in article 19, that "everyone shall have the right to hold opinions without interference" and that "everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds". Such rights necessarily apply to religion, as provided for in article 18 of the Covenant. Moreover, the Covenant requires States to provide special protection to religious minorities. In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practice their own religion, or to use their own language (art. 27 of the Covenant).

20. According to the source, because Christianity is a minority religion in the Islamic Republic of Iran, Mr. Abedini deserves to be protected in accordance with the stipulations in the Iranian Constitution and the International Covenant on Civil and Political Rights. By denying him his right to equal treatment under the law and his right to peacefully express his religious beliefs, the authorities have explicitly violated their obligations under the Covenant. Furthermore, due to his involvement in establishing an orphanage and encouraging the development of Christian house churches in the country, the authorities have arbitrarily deprived Mr. Abedini of his liberty and subjected him to inhuman treatment. The source submits that Mr. Abedini has been specifically targeted precisely for his religious expression, which is a violation of the special protections provided to religious minorities under article 27 of the Covenant.

21. The source submits that the violations suffered by Mr. Abedini, such as being unable to meet with his attorney until only hours before the trial began and their exclusion from the entire second day of his trial, have prevented Mr. Abedini from effectively formulating his legal defence. The source also informs the Working Group that a court administrator in the revolutionary courts intimidated and threatened those who attempted to assist Mr. Abedini with procuring bail. The source stresses that due to the existing problems, Mr. Abedini's trial falls short of satisfying the fundamental procedural rights set out under the International Covenant on Civil and Political Rights. Furthermore, human rights violations have occurred at every phase of the criminal procedure, from arbitrary pretrial detention and the use of severe and abusive interrogations to a binding court decision issued by a judge who the source alleges to be biased. The source points to these substantive violations, specifically highlighting the infringements of Mr. Abedini' s rights to freedom of expression, freedom of religion, freedom of peaceful assembly and freedom from inhuman treatment and torture.

Response from the Government

22. The Working Group regrets that the Government has not responded to the allegations transmitted by the Group on 21 June 2013.

23. Despite the absence of any information from the Government, the Working Group considers that it is in a position to render its opinion on the detention of Mr. Abedini in conformity with paragraph 16 of its methods of work.

Discussion

24. The Working Group recalls that the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran and the Special Rapporteur on freedom of religion or belief have expressed concern over the situation of religious minorities, including Christians, in the Islamic Republic of Iran.1 The Special Rapporteur on the situation of human rights in the Islamic Republic of Iran stressed that the arrest and prosecution of individuals for religious affiliation ran counter to the protection of minority religions in the Iranian Constitution and constituted a violation of the State's obligations under the International Covenant on Civil and Political Rights, in particular to respect freedom of religion and belief and freedom of expression and association.2 The experts emphasized that no individual should be arrested for peacefully exercising the rights to freedom of religion and belief and to freedom of expression and association. According to the Special Rapporteur on freedom of religion or belief, the Islamic Republic of Iran should ensure that the right of Christians, as a group, to freedom of religion is granted in practice.3

25. The Human Rights Committee, in paragraph 1 of its general comment No. 22 (1993), emphasized that the right to freedom of thought, conscience and religion (which includes the freedom to hold beliefs) in article 18, paragraph 1, of the International Covenant on Civil and Political Rights is far-reaching and profound; it encompasses freedom of thought on all matters, personal conviction and the commitment to religion or belief, whether manifested individually or in community with others.

26. In another case concerning the Islamic Republic of Iran, the Working Group stressed that the detention of persons solely because of the practice of their religious faith is a violation of the freedom of religion, which is a fundamental right recognized both in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.4

27. The Working Group considers that in the case under consideration Mr. Abedini has been deprived of his liberty for peacefully exercising the rights to freedom of religion, belief and association, as guaranteed under article 19 of the Universal Declaration of Human Rights, and articles 18 (para. 1) and 19 (para. 2) of the

International Covenant on Civil and Political Rights. Thus, the deprivation of liberty of Mr. Abedini falls within category II of the arbitrary detention categories referred to by the Working Group when considering cases submitted to it.

28. The Working Group also considers that in this case Mr. Abedini has been deprived of his liberty for being a practising Christian, which amounts to discrimination based on religion, in violation of articles 2 and 7 of the Universal Declaration of Human Rights, as well as articles 18 and 26 of the International Covenant on Civil and Political Rights. Thus, the deprivation of liberty of Mr. Abedini falls within category V of the arbitrary detention categories referred to by the Working Group when considering cases submitted to it.

29. The Government has also chosen not to rebut the allegations of the violation of Mr. Abedini's right to a fair trial as guaranteed under article 14 of the International Covenant on Civil and Political Rights and article 10 of the Universal Declaration of Human Rights.

30. Such allegations include that, in violation of article 14, paragraph 3 (b), of the International Covenant on Civil and Political Rights, which guarantees the right of the accused to have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing, Mr. Abedini was denied access to his lawyer until less than 24 hours before the commencement of the trial.

31. Furthermore, in violation of article 14, paragraph 3 (d) and (e), of the Covenant, on the second day of the trial, Mr. Abedini and his lawyer were barred from the courtroom while the witnesses, including acquaintances and lay ministers (religious leaders), testified.

32. The Working Group considers that the non-observance of the international norms relating to the right to a fair trial in this case, namely article 10 of the Universal Declaration of Human Rights and article 14, paragraph 3 (b), (d) and (e), of the International Covenant on Civil and Political Rights, is of such gravity as to give the deprivation of liberty of Mr. Abedini an arbitrary character. Thus the deprivation of liberty of Mr. Abedini falls within category III of the arbitrary detention categories referred to by the Working Group when considering cases submitted to it.

Disposition

33. In the light of the foregoing, the Working Group on Arbitrary Detention renders the following opinion:

The deprivation of liberty of Mr. Abedini has been arbitrary, being in contravention of articles 2, 7, 10 and 19 of the Universal Declaration of Human Rights and articles 14 (para. 3), 18 (para. 1), 19 (para. 2) and 26 of the International Covenant on Civil and Political Rights; it falls within categories II, III and V of the arbitrary detention categories referred to by the Working Group when considering cases submitted to it.

34. Consequent upon the opinion rendered, the Working Group requests the Government to take the necessary steps to remedy the situation of Mr. Abedini and bring it into conformity with the standards and principles set forth in the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.

35. The Working Group is of the opinion that, taking into account all the circumstances of the case, the adequate remedy would be to release Mr. Abedini and accord him an enforceable right to compensation in accordance with article 9, paragraph 5, of the International Covenant on Civil and Political Rights.

36. In accordance with article 33 (a) of its revised methods of work, the Working Group considers it appropriate to refer the allegations of torture to the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment for appropriate action.

[Adopted on 26 August 2013]


Notes_____

1  See "UN experts on Iran and freedom of religion concerned over situation of religious minorities in the country", Geneva, 20 September 2012. Available from www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=12551&LangID= E.

2  Ibid.

3  Ibid.

4  Opinion No. 39/2008 (Islamic Republic of Iran), adopted on 24 November 2008, para. 17.