## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAEED ABEDINI, *et al.*,

      Plaintiffs,

        v.

THE GOVERNMENT OF THE
ISLAMIC REPUBLIC OF IRAN, *et al.*,

      Defendants.

Civil Action No. 18-588 (JEB)

## MEMORANDUM OPINION

Plaintiff Saeed Abedini has spent 1,268 days of his life in captivity. In July 2012, the

Iranian Revolutionary Guard Corps took him hostage and detained him until January 2016. For

three and a half years, Abedini was interrogated, tortured, and beaten. He and his sister,

Zibandeh Abedini Galangashy, now come before this Court seeking recompense for their injuries

and punishment for Defendants, the Islamic Republic of Iran and its instrumentalities.

Specifically, Plaintiffs seek to hold Iran liable for damages under the terrorism exception to the

Foreign Sovereign Immunities Act. As Iran failed to appear, default was entered last year. It

now falls to the Court to determine whether to award default judgment and, if so, what damages

are appropriate.

As Plaintiffs have complied with all procedural prerequisites, the first task is easy: a

default judgment is appropriate in this case. Determining the fair <u>amount</u> of damages,

conversely, requires a difficult weighing of relative injuries. The Court ultimately holds that

respective sums of $44,621,460 to Abedini and $2,547,716 to Galangashy are appropriate, yielding a total of $47,169,176.

## I.    Background

Abedini was born and raised in Iran, where he converted to Christianity as a young adult and became a pastor in the home-church movement.  See ECF No. 18 (Memorandum in Support of Motion for Default Judgment) at 2.  He later moved to the United States with his wife — a U.S. national — where they raised their two children.  Id. at 3–4.  In the summer of 2012, Abedini returned to Iran to help oversee an orphanage there.  Id., Exh. A (Declaration of Saeed Abedini), ¶ 18.  During this trip, on July 28, the Islamic Revolutionary Guard Corps seized Abedini and took him hostage.  See Default J. Memo at 2; Abedini Decl., ¶ 18.  Throughout his confinement, Abedini suffered unbearable conditions, including frequent threats and torture.  For over three years, he was housed in Evin Prison and Rajai Shahr Prison.  See Abedini Decl., ¶¶ 62, 89, 94.  He was commonly forced to live in cells covered in human waste, id., ¶¶ 31, 102, and he was denied proper nourishment and medical treatment.  Id., ¶¶ 43–45, 93, 101.  Often, he was surrounded by inmates who repeatedly beat him.  Id., ¶¶ 96–97, 104.

Early in his confinement, Abedini faced trial without a lawyer.  See Default J. Memo at 5. He was sentenced to death for "being a United States spy and for his Christian faith."  Id.; see also id. at 12–13.  After his trial, he lived in constant fear of his impending execution.  See Abedini Decl., ¶¶ 80, 117–18.  When he refused to confess to these alleged crimes — or refused to name others involved in the home-church movement in Iran — IRGC guards would beat him. Id., ¶¶ 36, 47–51, 55, 65, 68–69.  He was whipped on his back and feet, shocked using a taser gun on his kidneys, and hung by handcuffs from the ceiling.  Id., ¶¶ 51, 57.  IRGC guards would

threaten to rape, imprison, and kill his family.  Id., ¶¶ 52–53.  As part of the torture, Abedini was forced into a "living grave" — a drawer with no light, food, water, or space to move.  Id., ¶ 69.

Having survived these conditions, Abedini was finally released on January 16, 2016, with four other American prisoners in exchange for clemency for seven Iranians who had been indicted or imprisoned in the U.S.  See Default J. Memo at 19.  After his release, his marriage crumbled, and he moved from city to city in constant fear that agents of Iran would come after him again.  Id. at 20–21.

During her brother's captivity, Galangashy worried that she, too, would be targeted by Iran.  Id. at 24–25.  Fearing for her own safety, she moved to the U.S. in 2013, forcing her to fall behind in her pursuit of a B.A. in Psychology.  Id. at 25–26.  After learning of her brother's confinement and death sentence, she constantly feared for his life.  Id. at 26.  Following his release, she ultimately continued her studies in Lynchburg, Virginia, where she now lives with him.  Id. at 26–27.

Plaintiffs filed this suit on March 16, 2018, and named Iran and "Its Ministries, Agencies, and Instrumentalities" as Defendants.  See ECF No. 1.  (The Court will refer to Defendants collectively as Iran.)  Plaintiffs effected service on October 1, 2018.  See ECF No. 22 (Service Opinion) at 6.  Iran failed to answer the Complaint, and Plaintiffs requested an entry of default on December 3, 2018, which was granted one week later.  See ECF Nos. 10, 14.  Plaintiffs then moved for default judgment.  This Court held an evidentiary hearing on September 20, 2019, where it heard testimony from both Plaintiffs, as well as from their psychological and political experts.  Having carefully considered their written statements and oral testimony, the Court now decides both liability and damages.

## II. Legal Standard

Where a defendant is "totally unresponsive," the Court may enter default judgment if the default is plainly willful — as reflected by a defendant's failure to respond to the summons and complaint, the entry of default, or the motion for default judgment. Gutierrez v. Berg Contracting Inc., No. 99-3044, 2000 WL 331721, at *1 (D.D.C. March 20, 2000) (quoting Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)). In the "'absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense,' it is clear that the standard for default judgment has been satisfied." Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (quoting Gutierrez, 2000 WL 331721, at *1).

To obtain a default judgment in such an action, plaintiffs must establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Those who are successful may then recover damages by showing "that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and [proving] the amount of damages by a reasonable estimate." Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir. 2018) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)). While these requirements create "some protection against an unfounded default judgment," plaintiffs need not produce "more or different evidence than [a court] would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." Id. (alteration in original) (quoting Owens v. Republic of Sudan, 864 F.3d 751, 785 (D.C. Cir. 2017)). In any event, when a foreign state fails to make an appearance, the court must still determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for his claims. See Jerez v. Republic of Cuba, 777 F. Supp. 2d 6, 18–19 (D.D.C. 2011).

**III.    Analysis**

The Court will proceed in three steps.  It begins by addressing jurisdictional prerequisites,

then evaluates Defendants' liability, and finishes by determining appropriate damage awards.

A.    Jurisdiction

Foreign states are generally immune from suit in U.S. federal court.  See 28 U.S.C.

§ 1604.  "[T]he FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in federal

court," Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989), and it

grants "a federal district court . . . personal and subject matter jurisdiction over a foreign entity in

certain circumstances."  Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 148 (D.D.C. 2011).

1.    *Subject-Matter Jurisdiction*

Those circumstances are codified in the FSIA.  See 28 U.S.C. §§ 1330(a), 1604.

Relevant here is § 1605A, the so-called "terrorism exception."  See Fraenkel, 892 F.3d at 352.

Plaintiffs may establish subject-matter jurisdiction under this exception by showing that (a) the

foreign state lacks immunity and (b) their claim may be heard in a U.S. court.  See 28 U.S.C. §

1605A(a)(1)-(2).

a.    No Immunity

The terrorism exception provides that "[a] foreign state shall not be immune from the

jurisdiction" of U.S. courts where (1) "money damages are sought" (2) "against a foreign state"

for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, . . . hostage

taking, or the provision of material support or resources for such an act."  Id. at § 1605A(a)(1);

see also Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) (quoting this

language); Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 32 (D.D.C. 2012) (same).

Both Plaintiffs' claims meet all five conditions. First, they seek only money damages. See ECF No. 17 (Motion Default Judgment) at 2. Second, they lodge their claim against Iran and its "Ministries, Agencies, and Instrumentalities." Compl. at 1. Third, Plaintiffs allege extensive personal injuries including physical harm and mental anguish. Id., ¶¶ 16–64. Fourth, the IRGC caused Plaintiffs' injuries. See Abedini Decl., ¶ 18 (naming IRGC as perpetrator); see also Schertzman Cohen v. Islamic Republic of Iran, No. 17-1214, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019) (holding IRGC "is part of the Iranian government"). Fifth, and finally, Iran both (i) tortured Abedini and (ii) took him hostage within the meaning of the FSIA, as the Court now explains in more detail.

i.   Torture

The FSIA adopts the definition of "torture" found in Section 3 of the Torture Victim Protection Act of 1991. See 28 U.S.C. § 1605(h)(7) (citing id. § 1350 note (TVPA)). The TVPA, in turn, defines "torture" as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering[,] . . . whether physical or mental, is intentionally inflicted  on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual[,] . . . intimidating or coercing that  individual or a third person, or for any reason based on discrimination of any kind.

TVPA § 3(a)(1).

This definition encompasses "prolonged mental harm" caused by threats of immediate bodily injury, death threats, and threats against family members. Id. § 3(a)(2)(A)–(D). When identifying what conduct constitutes torture, our Circuit uses two measures: (1) "the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim";

and (2) the extent to which the "production of pain and suffering is purposive." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir. 2002) (Price I).

On step one, acts of torture must be "sufficiently extreme and outrageous to warrant . . . universal condemnation." Id. at 92. The IRGC certainly inflicted such severe mental and physical pain and suffering upon Abedini. See, e.g., id. at 92–93 ("'[T]orture . . . is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.' . . . The more intense, lasting, or heinous the agony, the more likely it is to be torture.") (quoting S. Exec. Rep. No. 101-30, at 14 (1990)); Azadeh v. Islamic Republic of Iran, No. 16-1467, 2018 WL 4232913, at *11–12 (D.D.C. Sept. 5, 2018) (finding Iranian actors tortured plaintiff at Evin Prison by confining her in small cell with poor light and toilet facilities, denying her medical care, and endlessly interrogating and threatening her each day); Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (finding torture where plaintiff was incarcerated with inadequate sanitary facilities and no medical care).

Throughout his confinement, Iranian guards repeatedly beat, shocked, and whipped Abedini. See Default J. Memo at 5–7. They kept him in "stress positions" — hung from the ceiling by handcuffs, id. at 7, and forced into a "drawer" with "no space to move." Id. at 10. He was repeatedly denied medical treatment and consequently suffered from severe physical ailments. Id. at 9, 14, 17. The IRGC also tormented Abedini, ordering his execution shortly after his confinement and frequently taunting him about his impending death. Id. at 5, 18. Every day he woke up not knowing when or how he might be executed. Id. Abedini suffered through nearly three and a half years of systematic abuse. The IRGC's actions are undoubtedly "extreme and outrageous" conduct amounting to torture under the FSIA.

Second, to constitute torture, conduct must be "intentional and malicious," "not merely haphazard." Price I, 294 F.3d at 93. The Court has no difficulty concluding that the IRGC deliberately and purposefully abused Abedini while he was in captivity. See Daliberti, 146 F. Supp. 2d at 25 (finding intentional torture where plaintiff was threatened for refusing to give false confession). Like in Daliberti, Defendants wanted Abedini to falsely confess that he was a CIA spy "on a mission to overthrow the Iranian government." Default J. Memo at 5. When he refused, the guards beat him. Id. at 6–7. Likewise, guards punished him for refusing to renounce his Christian faith or identify other individuals involved in Iran's home-church movement. Id. at 10. There can be no cavil about the intentional nature of this conduct.

ii.  Hostage Taking

The FSIA adopts the definition of "hostage taking" found in Article 1 of the International Convention Against the Taking of Hostages (ICATH). See 28 U.S.C. § 1605A(h)(2). "'Hostage taking' occurs under the ICATH (and so under the FSIA) when a person 'seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of a hostage.'" Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 234 (D.C. Cir. 2003) (Simpson I) (omission in original) (quoting Art. 1, ICATH, U.N. GAOR, Supp. No. 39, U.N. Doc. A/34/39 (1979)). "The essential element of [a] hostage-taking claim is that the intended purpose of the detention be to accomplish . . . [some] third-party compulsion." Id. at 234–35 (citing Price I, 294 F.3d at 94). Simply stated, for Abedini's confinement to be "hostage taking," Defendants must have made his release conditional — explicitly or implicitly — on the actions or inactions of someone other than himself. Plaintiffs argue — and the Court agrees — that Abedini's captivity was intended to compel the U.S. to release Iranian prisoners. See

Daliberti, 146 F. Supp. 2d at 25 (finding hostage taking when plaintiff's release was "conditione[d] . . . on the receipt of humanitarian aid and/or the lifting of sanctions or the United Nations embargo").

The Court need not dive too deep into Iran's original intent because it did, in fact, leverage Abedini's captivity to compel American action.  See Default J. Memo at 35.  Iran detained three other dual citizens around the time of Abedini's abduction, see Abedini Decl., ¶ 127, including Amir Hekmati.  See Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 150–52 (D.D.C. 2017).  The IRGC held Hekmati in the same facility as Abedini — Evin Prison — where he survived similar conditions.  Id.  Despite having little in common — Abedini is a pastor and Hekmati was a Marine with the U.S. military — each was tortured after refusing to falsely confess that he was a spy working for the CIA.  Id. at 152; Default J. Memo at 5.  The IRGC expressly told Hekmati that "his Government — meaning the United States — needed to cooperate if he was to be released."  Hekmati, 278 F. Supp. 3d at 152 (internal quotation marks and alterations omitted).  Hekmati and Abedini were both ultimately released on January 16, 2016, as part of the same prisoner exchange.  See Michael Pearson and Elise Labott, *5 Americans Released by Iran, 4 as Part of Prisoner Swap*, CNN (Jan. 16, 2016), https://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/index.html.  The U.S. — in exchange for the IRGC's release of four detainees — granted clemency to seven Iranians indicted or imprisoned here.  See Hekmati, 278 F. Supp. 3d at 154; Mot. Default J., Exh. C (Expert Report of Dr. Mehdi Khalaji), ¶ 62.  As Abedini's release was explicitly conditional, he was a hostage under the FSIA definition, and Plaintiffs have thus satisfied all five requirements.  The Court thus concludes Iran does not have immunity under that Act.

b.   Hear Claim

FSIA plaintiffs face an additional hurdle.  Section 1605A(a)(2) provides that "[t]he court shall hear a claim under this section" only if three conditions are met: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . and . . . remains so designated when the claim is filed"; (2) "the claimant or the victim was, at the time [of] the act[,] . . . a national of the United States"; and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).

Plaintiffs meet all three conditions.  Iran has been designated as a state sponsor of terrorism since 1984.  See Dep't of State, Bureau of Counterterrorism, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Oct. 23, 2019). Second, Abedini, the victim, is — and was at the time of his captivity — a U.S. national.  See Compl., ¶¶ 13, 38.  Even though Galangashy is not, a claim will be heard whenever "the claimant or the victim" was a U.S. national at the time of the incident.  See 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added).  Finally, Plaintiffs offered Iran a reasonable opportunity to arbitrate the claim by including an arbitration offer in the documents served on the country. See ECF No. 9 (State Dep't Service Affidavit); see also Simpson I, 326 F.3d at 233 (finding arbitration offer filed after complaint gave defendant "a 'reasonable opportunity' to arbitrate") (quoting 28 U.S.C. § 1605(a)(7)(B)(i)).  This Court therefore has subject-matter jurisdiction pursuant to 28 U.S.C. § 1605A.

2.   *Personal Jurisdiction*

Moving on, the Court may exercise personal jurisdiction over a foreign state if service of process is properly effectuated under 28 U.S.C. § 1608(a).  See, e.g., Schubarth v. Fed. Republic

of Germany, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018).  This Court has previously determined —
in its July 11, 2019, Opinion — that Plaintiffs properly served Defendants.  See ECF No. 22.
Iran is thus subject to personal jurisdiction in this Court.

### 3.    *Federal Cause of Action*

In 2008, the FSIA was amended to provide a federal cause of action to: "(1) a national of
the United States, (2) a member of the armed forces, (3) an employee of the Government of the
United States[,] . . . or (4) the legal representative of [such persons described above]."  28 U.S.C.
§ 1605A(c); see also Owens v. Republic of Sudan, 864 F.3d 751, 808 (D.C. Cir. 2017)
(explaining how, pre-amendment, the FSIA operated as a "pass through" statute allowing state
claims to proceed under federal jurisdiction).  "Although § 1605A created a new cause of action,
it did not displace a claimant's ability to pursue claims under applicable state or foreign law"
upon showing subject-matter jurisdiction.  See Owens, 864 F.3d at 808 (quoting Leibovitch v.
Islamic Republic of Iran, 697 F.3d 561, 572 (7th Cir. 2012)).

At this juncture, Plaintiffs' claims diverge.  Abedini is a U.S. national and therefore has a
federal cause of action under the FSIA.  See Compl., ¶¶ 13, 38.  Galangashy, however, was not a
U.S. national at any point during Abedini's captivity and thus concedes that she does not have a
federal cause of action.  See Default J. Memo at 39; see also Estate of Doe v. Islamic Republic of
Iran, 808 F. Supp. 2d 1, 18 (D.D.C. 2011) ("A straightforward reading of § 1605A(c) creates a
cause of action for four categories of individuals . . . . Absent from these four categories are non-
U.S. national family members of the victims of terrorist attacks."); Owens, 826 F. Supp. 2d at
152 ("The plain meaning approach to statutory construction governs the Court's interpretation of
§ 1605A(c).").  Despite lacking a federal cause of action, this Court maintains jurisdiction over
Galangashy's claims because the victim — Abedini — is a U.S. national.  See 28 U.S.C.

§ 1605A(a)(2)(A)(ii) (granting jurisdiction when "[t]he claimant or the victim was . . . a national of the United States"). The Court must thus separately assess Galangashy's ability to recover under applicable state law. See Owens, 864 F.3d at 809 (holding § 1605A(c) does not "foreclose access to state law by those who need it, as do foreign family members," and "the pass-through approach remains viable" for them).

B.    Liability

There can be no question that Iran caused Plaintiffs' injuries. See Abedini Decl., ¶ 18 (naming IRGC as perpetrators); Schertzman Cohen, 2019 WL 3037868, at *3 (holding IRGC "is part of the Iranian government"). Having so found "by evidence satisfactory to the court," see 28 U.S.C. § 1608(e), the Court now turns to each Plaintiff's theories of liability, beginning with Abedini's FSIA claims and proceeding to Galangashy's.

1.    *Abedini*

Although § 1605A provides a private right of action, it still requires plaintiffs "to prove a theory of liability." Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 176 (D.D.C. 2010). ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). Consistent with guidance from the D.C. Circuit, district courts "rely on well-established principles of law, such as those found in Restatement (Second) of Torts," to determine liability under the FSIA. See *In re* Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 61 (D.D.C. 2009); see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (using Restatement "as a proxy for state common law" in determining FSIA liability). Here, Abedini asserts four such theories: assault, battery, false imprisonment, and intentional infliction of emotional distress.

First, an assault occurs when a person "(a) 'acts intending to cause a harmful or offensive contact with the person . . . or an imminent apprehension of such a contact, and (b) the [person] is thereby put in such imminent apprehension.'" Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21). By their very nature, torture and hostage taking subject the victim to "imminent apprehension of harmful or offensive contact" at all times while in captivity. See Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 48 (D.D.C. 2001) (finding assault when plaintiff "lived for over six years in an environment where, at any moment, he might [be] harassed or beaten for virtually no reason at all"). Thus, hostages who are tortured or threatened "withst[and] a continuous . . . tortious assault" that infects every moment of their captivity. Id.; see also Stansell, 217 F. Supp. 3d at 343 (finding "imminent apprehension of death" when victims "tortured . . . with mock executions and visible preparations to kill them"). Given the facts recounted above, Defendants are plainly liable for assault.

Second, battery liability arises when: "(1) 'acts [are] intend[ed] to cause a harmful or offensive contact with [a person] . . . or [cause] an imminent apprehension of such a contact, and (2) a harmful contact with [that person] directly or indirectly results.'" Stansell, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts § 13). "Harmful contact" includes "any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts § 15. Acts of torture — like those Abedini endured — undeniably meet this bar. See Stansell, 217 F. Supp. 3d at 342 ("[T]he acts of physical torture — e.g., chaining the hostages to one another and to trees . . . [and] imposing unwanted medical treatment on them — were direct, intentional, harmful contacts."); Sutherland, 151 F. Supp. 2d at 48 (finding battery when captor beat hostage with rubber hose). This Court has little difficulty concluding that the

IRGC repeatedly battered Abedini when, for example, they electrocuted him with a taser gun, hung him from the ceiling by handcuffs, and whipped his back and feet.  See Default J. Memo at 7.

Third, a defendant is liable for false imprisonment when: "(a) he acts intending to confine [a person] within [fixed] boundaries[,] . . . (b) his act directly or indirectly results in such a confinement of the other, and (c) the [victim] is conscious of the confinement or is harmed by it."  Sutherland, 151 F. Supp. 2d at 49 (first alteration in original) (quoting Restatement (Second) of Torts § 35).  By this standard, Defendants falsely imprisoned Abedini for 1,268 days.  Id. ("There is no question in the Court's mind, or anyone else's for that matter, that [Plaintiff] was falsely imprisoned by Hizbollah for 2,354 days.").

Finally, Abedini claims intentional infliction of emotional distress (IIED).  "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results, for such bodily harm."  Restatement (Second) of Torts § 46; Sutherland, 151 F. Supp. 2d at 49.  Torture, by definition, involves "extreme and outrageous" conduct, see Price I, 294 F.3d at 91–92, and holding a person hostage for multiple years is "well n[i]gh extreme and outrageous."  Sutherland, 151 F. Supp. 2d at 49.  As this Court has already noted, Iran's actions were intentional — indeed, they were an attempt to compel the U.S. to release Iranian prisoners. See Default J. Memo at 35.  Additionally, once in prison, Defendants' guards intentionally harassed and abused Abedini by threatening to rape, torture, and kill his family; denying him much needed medical care; threatening his death; and keeping him from performing basic bodily functions.  Id. at 7–9; Stansell, 217 F. Supp. 3d at 343 (finding plaintiff suffered severe mental anguish when denied medical care and repeatedly threatened with death).  As a result of his

14

imprisonment, Abedini now suffers from PTSD and clinical depression.  See Default J. Memo,

Exh. D (Expert Report of Dr. Stuart Grassian) at 14–16.  Defendants are thus liable to Abedini

for his severe emotional distress, along with the other torts described above.

2.  *Galangashy*

As discussed in Section III.A.3, *supra*, Galangashy lacks a federal cause of action under

the FSIA because she is not a U.S. national.  Her claims, however, may proceed as state-

common-law torts.  See Owens, 864 F.3d at 809 (holding foreign family members of FSIA

victims may "pursue claims under applicable state or foreign law upon the waiver of sovereign

immunity") (quoting Estate of Doe, 808 F. Supp. 2d at 20).  This Court must determine which

state's law applies before moving to the merits of her claims.

a.  Choice of Law

As the forum state, the District of Columbia's choice-of-law rules govern.  See Estate of

Doe, 808 F. Supp. 2d at 20.  The Court employs this tool in assessing whether the law of Iran,

D.C., or Virginia (where Galangashy lives) should control.  "To determine which jurisdiction's

substantive law governs a dispute, District of Columbia courts blend a 'governmental interests

analysis' with a 'most significant relationship' test."  Oveissi, 573 F.3d at 842 (quoting Hercules

& Co., Ltd. v. Shama Rest. Corp., 566 A.2d 31, 40–41 & n.18 (D.C. 1989)); see also Estate of

Doe, 808 F. Supp. 2d at 20.  In two similar cases in this district — involving non-U.S. family

members of FSIA claimants — courts concluded that D.C. law applied when choosing among

"the law of the forum state" (D.C.), "the law of the place of the tort" (England, California, Idaho,

or Virginia), or "the law of the domicile state or country of [the] plaintiff" (Virginia).  Id. at 21;

Owens 826 F. Supp. 2d at 154.

First, "under the governmental interests analysis[,] . . . we must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." Estate of Doe, 808 F. Supp. 2d at 20 (quoting Dammarell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090, at *18 (D.D.C. May 12, 2005)). This factor easily favors applying U.S. law over foreign law because "[i]n terrorism cases, '[t]he United States has a unique interest in having its domestic law — rather than the law of a foreign nation — used in the determination of damages.'" Id. at 22 (quoting Holland v. Islamic Republic of Iran, 496 F. Supp. 2d 1, 22 (D.D.C. 2005)); see also Oveissi, 573 F.3d at 843 ("We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when . . . the attacks are 'by reason of their nationality.'") (quoting Dammarell v. Islamic Republic of Iran, 2005 WL 756090, at *20 n.16). Likewise, D.C.'s governmental interests in uniformity and judicial economy favor applying its law over Virginia's. See Estate of Doe, 808 F. Supp. 2d at 22–23. Although not granting a cause of action to non-U.S. family members, Congress intended to make FSIA damages more consistent, and applying D.C. law to their claims furthers this goal. Id. at 23 ("Without doubt, applying [D.C.] law will provide greater uniformity of result, as individual plaintiffs domiciled in different states and foreign nations will all be subject to the same substantive law.").

Second, "[f]or the most significant relationship component of the analysis, the D.C. Court of Appeals . . . identifies four relevant factors: (i) 'the place where the injury occurred'; (ii) 'the place where the conduct causing the injury occurred'; (iii) 'the domicile, residence, nationality, place of incorporation and place of business of the parties'; and (iv) 'the place where the relationship, if any, between the parties is centered.'" Id. at 20-21 (quoting Restatement of

Conflict of Laws § 145). "The Restatement also references the 'needs of the interstate and the international systems, the relevant policies of the forum, the relevant policies of other interested states, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied.'" Id. at 21. Applying the four factors above provides little guidance in the instant case as Galangashy lived in two different countries — the U.S. and England — and three different states — California, Idaho, and Virginia — while her brother was in captivity. See Default J. Memo at 25–26. The place of the emotional injury thus unhelpfully points in multiple directions. When an injury is of this nature — caused by distant conduct — and where the tortious conduct spanned three years, the Court turns to "certainty, predictability and uniformity of result." Estate of Doe, 808 F. Supp. 2d at 21. In the past, applying the laws of different states led to inconsistent results among family members of FSIA terrorism victims. See Owens, 826 F. Supp. 2d at 147. Courts have thus applied D.C. law to similar claims to ensure consistency and predictability amongst those family members. See, e.g., id. at 156; Estate of Doe, 808 F. Supp. 2d at 23. Persuaded that this is the preferable approach, this Court will apply D.C.'s standards of liability to Galangashy's claims.

> b. IIED Liability

Galangashy raises one theory of liability under D.C. law — IIED. See Republic of Sudan v. Owens, 194 A.3d 38, 42 (D.C. 2018) (allowing non-U.S. immediate family members to recover for IIED in cases where FSIA terrorism exception applies). In IIED cases brought by family members of victims injured by tortious conduct, D.C. law imposes liability when the defendant "(1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members — the immediate []

family requirement — who were present at the time such conduct occurred — the presence requirement." Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(1)–(2)(a)); see also Owens, 194 A.3d at 42 (adopting Restatement elements). The Court will assess each element in turn.

First, acts of terror are inherently "extreme and outrageous," Valore, 700 F. Supp. 2d at 77 (quoting Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8 (D.D.C. 2009)), and this element is satisfied when a victim's family member brings an IIED claim. See Sutherland, 151 F. Supp. 2d at 50; Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35–36 (D.D.C. 2001). By taking Abedini hostage and torturing him, Defendants engaged in "extreme and outrageous" conduct.

Both the second and third elements were satisfied when the IRGC imprisoned Abedini — intentionally causing Galangashy severe emotional distress. First, Galangashy did in fact suffer such distress. See Sutherland, 151 F. Supp. 2d at 50 (finding wife of hostage suffered severe emotional distress during his captivity by "liv[ing] a life of isolation and dashed hopes" for over six years and suffering "repeated anxiety attacks"). Galangashy alleges that she underwent immense emotional pain as a result of her brother's abduction. She had vivid nightmares of abductions and attacks, and she uprooted her life in England and moved to the U.S. out of fear that Iran was tracking her whereabouts. See Default J. Memo at 24–25.

Iran, moreover, intentionally caused that distress. See Sutherland, 151 F. Supp. 2d at 50 (finding intent because hostage taking "is implicitly intend[ed] to cause emotional distress among the members of that hostage's immediate family" and the captor "implicitly believes that such emotional distress is substantially certain to result"). Even though Defendants sought to leverage Abedini's captivity against the U.S. — and not Galangashy — they still inflicted

intentional harm upon Galangashy because "even if the hostage's country (rather than his family) pays for his release, a hostage's loved ones play a vital role in agitating for governmental action." Id. At the very least, these elements are satisfied because Defendants "acted in callous disregard of the obvious risk that such emotional distress would result." Id.

Finally, Galangashy is an immediate family member, see Jenco, 154 F. Supp. 2d at 36 n.8 (stating immediate family members include siblings), and the presence requirement does not apply to family members of hostages. Id. at 36 (holding presence requirement not applicable in hostage cases because "plaintiff's lack of presence is the exact source of his emotional distress," and "limit[ing] recovery in hostage cases using a 'presence' test . . . would [bar] recover[y] despite there being extremely strong evidence of significant emotional suffering"); Owens, 194 A.3d at 42 ("[P]resence at the scene is not required in this special [terrorism] context."). As Abedini's sister, Galangashy can recover for IIED under D.C. law.

C.    Damages

While establishing liability here is relatively straightforward, that is not the case with the amount of damages to award. The valuation of serious psychological injuries among victims and family members is an inherently delicate task, not susceptible to rote calculations. The Court will first address each Plaintiff's individual damages before turning to punitives.

1.    *Abedini*

The FSIA expressly allows Abedini to pursue "economic damages" and those for "pain and suffering." See 28 U.S.C. § 1605A(c). To obtain damages for an FSIA claim, "a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and [he] must prove the amount of damages by a reasonable estimate." Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 69 (D.D.C. 2015) (quoting Reed v. Islamic Republic of Iran, 845 F.

Supp. 2d 204, 213 (D.D.C. 2012)).  For reasons already discussed, Defendants' actions were "reasonably certain" to injure Abedini.  The Court now considers whether the amounts he requests for two types of damages are "reasonable estimates."

    a.  Pain and Suffering

Abedini has presented extensive and shocking evidence of the mental and physical torture he endured during his 1,268-day imprisonment.  He seeks damages for both pre- and post-release pain and suffering.  See Default J. Memo at 44–45.  He asks for $12,268,000 in pre-release damages (although this number seems to be misstated later in the Motion, id. at 45, the Court uses the amount listed in the prayer for relief) and $10,000,000 in post-release damages.  Id. at 46.

In hostage-taking cases, this district applies a per-diem formula — awarding $10,000 per day of captivity — to compensate for injuries sustained while imprisoned.  See, e.g., Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 163–64 (D.D.C. 2017) (awarding $16.02 million for 1,602 days of imprisonment); Stansell, 217 F. Supp. 3d at 346 ($19.67 million for 1,967 days in captivity); Moradi, 77 F. Supp. 3d at 70 ($1.68 million for 168 days of detention); Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 135–36 (D.D.C. 2005) (Price II) ($1.05 million for 105 days of captivity); Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 156–57 (D.D.C. 2010) ($5.03 million for 503 days of captivity).  Seeing no reason to deviate from this formula, this Court will award Abedini $12,268,000 for pre-release pain and suffering.

Although no such formula exists for calculating post-release damages, awards granted to similarly situated plaintiffs in FSIA lawsuits help guide the Court through this delicate terrain.  See Hekmati, 278 F. Supp. 3d at 163 ("The primary consideration in these cases is to ensure that

'individuals with similar injuries receive similar awards.'") (quoting <u>Moradi</u>, 77 F. Supp. 3d at 70). Many courts award lump-sum damages to compensate for post-release pain and suffering. <u>See, e.g.</u>, <u>Moradi</u>, 77 F. Supp. 3d at 70 (awarding $5 million for post-release damages following 168-day imprisonment causing severe and long-lasting PTSD and Major Depressive Disorder); <u>Price II</u>, 384 F. Supp. 2d at 136 ($7 million post-release damages to plaintiff suffering years of ongoing physical disabilities); <u>Wyatt v. Syrian Arab Republic</u>, 908 F. Supp. 2d 216, 231–32 (D.D.C. 2012) ($5 million lump-sum for 21-day imprisonment and post-release pain and suffering); <u>Massie v. Govt. of Democratic People's Republic of Korea</u>, 592 F. Supp. 2d 57, 77 ($13.4 million lump-sum for post-release damages). Central to determining the amount of these sums are "the victim's age at the time of release (the length of time he will be experiencing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and suffering)." <u>Hekmati</u>, 278 F. Supp. 3d at 164. Useful here are two cases that closely parallel Abedini's post-release damages claims.

First, in <u>Hekmati</u>, the plaintiff received $10 million beyond the $16.02 million in per-diem damages for post-release pain and suffering following his 1,602-day captivity at Evin Prison — the same prison where Abedini was held. <u>Id</u>. Second, in <u>Azadeh</u>, the plaintiff — also imprisoned at Evin Prison — received $8,888,889 above the per-diem award after her 114-day imprisonment. <u>See</u> 2018 WL 4232913, at *19–20. In <u>Azadeh</u>, the court used <u>Hekmati</u>'s $10 million as a base and prorated the damages to account for differences in the plaintiffs' life expectancies. <u>Id.</u>

Each plaintiff in <u>Hekmati</u> and <u>Azadeh</u> faced prison conditions similar to Abedini's. <u>Id.</u> at *20 (plaintiff denied proper nourishment, interrogated frequently, beaten and abused, and kept in stress positions); <u>Hekmati</u>, 278 F. Supp. 3d at 151–52 (same). Abedini was 35 when he was

released, and his life expectancy is around 43.2 years. See United States Life Tables 2011, 64 Nat'l Vital Stats. Reps., no. 11, at 11 (2015). Abedini's age at release, life expectancy, and time in captivity all fall between those in Hekmati — 32 at release, 45-year life expectancy, and 1,602 days in captivity — and Azadeh — 42 at release, 40-year life expectancy, and 114 days imprisoned. See Hekmati, 278 F. Supp. 3d at 164; Azadeh, 2018 WL 4232913, at *20. Because Azadeh was older — and had a shorter life expectancy — the court reduced her award from $10 million to $8.89 million. Id. In all respects, Abedini is more like Hekmati than Azadeh, and his damages will reflect that difference. Based on these considerations, the Court finds that $9,630,000 in post-release pain-and-suffering damages is appropriate. Combined with the $12,280,000 in per-diem damages, Plaintiff's total non-economic award is $21,898,000.

### b. Economic Damages

Abedini also seeks economic damages in the amount of $1,466,080. See Mot. Default J. at 2. "As a general rule, lost earnings — past and future — are compensable economic damages" under the FSIA. Moradi, 77 F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906). "The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case." Reed, 845 F. Supp. 2d at 214. This Court should, however, "take account of the reasonableness and foundation of the assumptions relied upon by the expert." Hekmati, 278 F. Supp. 3d at 164–65.

Abedini's experts attest that he would have made around $40,227 per year had he worked as a clergy member during his captivity between 2012 and 2016. See Mot. Default J., Exh. F (Abedini's Expert Report by Frank Slesnick) at 2. The Court will thus begin by awarding Abedini $164,974 to compensate him for lost wages while he was imprisoned between July 28,

2012, and January 16, 2016.  <u>See</u> Mot Default J., Exh. E (Abedini's Expert Report by Robert Taylor) at 14; Default J. Memo at 2, 19.

Turning to his post-release lost wages, Abedini claims he will never work again.  <u>See</u> Default J. Memo at 47.  The expert reports, however, present little evidence of Abedini's <u>complete</u> inability to work.  <u>See</u> Abedini-Taylor Rep. at 15–19.  His expert explains at length how PTSD and depressive disorder can <u>diminish</u> work capacity, yet falls short of demonstrating that these conditions render individuals completely incapable of securing or maintaining employment at any point in the future.  <u>Id.</u>  Abedini also points to his nomadic tendencies as a justification for his inability to secure work, but he acknowledges that traveling may not be a permanent feature of his life.  <u>Id.</u> at 10 ("[Abedini] is unsure if [he] will continue to move around in the future or try to 'settle down.'").

Although the Court cannot begin to fathom the day-to-day anxiety his captivity still causes him, Abedini did maintain a stable job immediately upon his release from captivity as a part-time pastor in Boise, Idaho.  <u>Id.</u> at 21.  It seems he left this job for unexceptional reasons — including his divorce and his move to Virginia.  <u>See</u> Default J. Memo at 20–21.  Indeed, after his release, he earned $12,540 between 2016 and 2017.  <u>See</u> Abedini-Taylor Rep. at 3.  He has thus demonstrated an ability to secure employment in his line of work post-release and has not shown that the psychological effects will indefinitely exclude him from the workforce.  Under these circumstances, the Court finds it inappropriate to award Abedini damages compensating him for complete and permanent disability.  <u>See</u> <u>Azadeh</u>, 2018 WL 4232913, at *21 (awarding reduced damages when "there [was] no definitive evidence in the record that [p]laintiff [was] unable to continue to work at all, as the economic loss report assum[ed]").

Abedini's experts have not provided any alternative models for lost-wage calculations. See Abedini-Slesnick Rep. at 5. Instead, they request the average income of a clergy member — around $40,227 — per year for the next 24 years of Abedini's life. Id. at 2. The expert report then adjusts this base salary to account for inflation and taxes each year. Id. at 14. Because Abedini has not shown by "evidence satisfactory to the court," 28 U.S.C. § 1608(e), that he will never work again, the Court will award him five years of post-release lost wages (beginning January 16, 2016, and ending January 16, 2021), less the amount he earned between 2016 and 2017, at approximately the expert's suggested rate — viz., total of $247,756. Combined with pre-release damages, the Court awards Abedini $412,730 in economic damages.

2. *Galangashy*

Galangashy seeks (a) economic damages and (b) loss-of-solatium damages for her IIED claim.

a. Economic Damages

Galangashy asks for $367,321 in the first category to compensate for wages lost during Abedini's captivity and for the rest of her working life following his release. See Mot. Default J. at 2. Galangashy claims — and her experts attest — that "her ability to work and earn wages has been significantly affected" by her emotional injuries. Id., Exh. G (Galangashy's Expert Report by Robert Taylor) at 21. The standard for awarding economic damages to a victim's family members mirrors that used for the victim himself. See Reed, 845 F. Supp. 2d at 214 (awarding economic damages to victim's son based on forensic economist's report using "reasonable and well-founded assumptions").

Like Abedini, Galangashy was diagnosed with PTSD and clinical depression as a result of her brother's imprisonment. See Grassian Rep. at 14–16. She claims she lost one to two

years of future income because her brother's abduction delayed completion of her bachelor's degree — which she was pursuing at the time of his imprisonment and completed in May of this year. She attests that she would have made upwards of $36,545 per year had she completed her degree on time. See Galangashy-Taylor Rep. at 14–15; see also Hekmati, 278 F. Supp. 3d at 165–66 (accounting for delayed degree when calculating economic damages). The report, instead of assuming a delay in achieving a certain salary, assumes that Galangashy is permanently relegated to less skilled and lower-paying jobs including "Information Clerk," which pays on average $24,616. See Mot. Default J., Exh. H (Galangashy's Expert Report by Frank Slesnick) at 3. It does not consider a possible pay increase following her recent graduation. Given that her education was delayed — at most — for two years, and that Galangashy has been able to find administrative work following her brother's release, the Court will only award her the rough difference in earnings for the two-year delay: $23,858. See Galangashy-Slesnick Rep. at 2–3.

b. Loss of Solatium

Galangashy also seeks $1,875,000 in loss-of-solatium damages for her emotional pain and suffering during and following Abedini's captivity. See Mot. Default J. at 2. As defined by the D.C. Circuit last year in Fraenkel, these damages seek to compensate claimants for the "[m]ental anguish, bereavement and grief" resulting from a loved one's death or injury. See 892 F. 3d at 356–57. Non-U.S. family members of FSIA terrorism victims may recover these damages. See Mwila, 33 F. Supp. 3d at 41, 44; see also Wamai, 60 F. Supp. 3d at 89–90, 90–94 (awarding solatium damages to foreign family members for IIED under D.C. law). Although it is undeniably difficult to quantify a family member's suffering, "the Court may look to prior decisions . . . awarding damages for solatium" as guidance. Mwila, 33 F. Supp. 3d at 44

(quoting Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 29 (D.D.C. 2008)); Murphey,

740 F. Supp. 2d at 78.

The common framework for solatium damages was established in Heiser v. Islamic

Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006).  See Reed, 845 F. Supp. 2d at 214

(explaining that "[u]nder the Heiser framework, a spouse, child, or sibling may receive $4

million, $2.5 million and $1.25 million, respectively, for valid claims in which the family

member survived the terrorist act") (citing Heiser, 466 F. Supp. 2d at 271–359)).  Under this

framework, siblings of victims who were injured by, but survived, a terrorist attack receive $1.25

million.  Id.; see also Mwila, 33 F. Supp. 3d at 45 (awarding $1.25 million to sibling of surviving

embassy-bombing victim).  While this framework is not a mandatory measure of solatium

damages, see Fraenkel, 892 F.3d at 351 (holding that "[t]he decision in Heiser . . . is not binding

precedent" and that, subject to abuse-of-discretion review, district courts have wide latitude to

craft damage awards "based on the particular facts of each case"), courts have commonly

adopted the Heiser framework when awarding damages to family members in hostage-taking

cases.  See, e.g., Reed, 845 F. Supp. 2d at 213–14; Wyatt, 908 F. Supp. 2d at 232.  Seeing no

reason to part from this line of authority, this Court will use $1.25 million as the baseline for

Galangashy's solatium damages.

It will not, however, deviate upwards beyond the Heiser $1.25 million, as Galangashy

requests it to do.  Courts have found several factors significant when considering whether to

award a higher sum: (1) whether family members had an "extraordinarily close relationship" to

the victim, see Jenco, 154 F. Supp. 2d at 38 (noting upward deviation may be proper when

victim "fulfil[s] the role of father for his brothers"); (2) whether the family member's emotional

trauma was particularly severe, see Oveissi, 768 F. Supp. 2d 16, 29 (D.D.C. 2011) (awarding

26

50% upward deviation from <u>Heiser</u> framework to grandson of victim whose trauma affected his development at a young age because his family was forced to go into hiding); <u>Valore</u>, 700 F. Supp. 2d at 86; and (3) whether the circumstances of the attack made the suffering particularly agonizing for the family.  <u>See</u> <u>Daliberti</u>, 146 F. Supp. 2d at 26 (awarding $1.5 million to spouses of released victims who were forced to raise children alone and lived "never knowing if their husbands were being tortured or were even still alive").

None of these circumstances is acutely present in Galangashy's case.  Indeed, unlike in <u>Daliberti</u>, she was kept informed of her brother's whereabouts throughout his confinement.  <u>See</u> Default J. Memo at 8, 25–26.  Additionally, while Galangashy suffered severe paranoia, <u>id.</u> at 25, her emotional injuries did not physically manifest themselves like those supporting upward deviations in other cases.  <u>See</u> <u>Valore</u>, 700 F. Supp. 2d at 86 (awarding 25% upward departure to family member suffering "several nervous breakdowns" requiring hospitalization).  Although the siblings appear to have a close relationship, this does not, standing alone, justify an upward departure beyond that intended to compensate the severe emotional injuries all siblings inevitably share in similar circumstances.  <u>See</u> <u>Jenco</u> 154 F. Supp. 2d at 38 (finding unusually close relationship between siblings negated by fact of victim's survival of captivity).  This Court will thus award Galangashy $1.25 million in solatium damages as proscribed under <u>Heiser</u>.

3.    *Punitive Damages*

Although the aforementioned sums awarded to both Plaintiffs are considerable, there is more on the table.  Plaintiffs also ask the Court to award the eyebrow-raising sum of $5 billion in <u>punitive</u> damages.  "Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  <u>Oveissi</u>, 879 F. Supp. 2d at 55–56.  Such damages are not meant to compensate the victim but to "punish

outrageous behavior and deter such outrageous conduct in the future." Kim v. Democratic People's Republic of Korea, 87 F. Supp. 3d 286, 290 (D.D.C. 2015) (quoting Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 105 (D.D.C. 2012)).  When assessing punitive damages, courts do not differentiate between FSIA causes of action and foreign family members' claims brought under state law.  See Wamai, 60 F. Supp. 3d at 97–98 (awarding punitive damages to non-U.S. family members matching their compensatory damages recovered under state law).

To determine whether punitive damages under the FSIA are warranted, courts factor into their analysis "the character of the defendant's act; the nature and extent of harm to the plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant."  Flatow v. Islamic Republic of Iran, 999 F. Supp 1, 32 (D.D.C. 1998); see also Acosta, 574 F. Supp. 2d at 30 (applying this test).  Judges in this district have found that hostage taking and torture are "the quintessential embodiment of outrageousness," Jenco, 154 F. Supp. 2d at 38 (quotation marks omitted), and that the nature and extent of harm to a plaintiff confined in Iran's Evin Prison is "substantial and permanent."  Hekmati, 278 F Supp. 3d at 166.  Further, Iran's conduct of imprisoning and torturing Iranian-American citizens is "part of a longstanding pattern and policy, making the need for deterrence clear."  Id.  Lastly, Iran has "substantial" wealth.  Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 25 (D.D.C. 2016); see Default J. Memo at 54 (Iran's 2019 GDP estimate is $1.6 trillion).

Calibrating the actual amount of punitive damages for cases brought under the FSIA, however, "is never a simple task."  Hekmati, 278 F Supp. 3d at 166 (quoting Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 114 (D.D.C. 2000)).  For cases against Iran specifically, judges here have used at least four different methods over the past nineteen years: (1) the Flatow

method, (2) a flat $300 million award, (3) applying a court-determined multiplier on compensatory damages, and (4) awarding punitive damages equal to compensatory damages.

Plaintiffs recommend the use of the <u>Flatow</u> method to calculate a $5 billion award. This method multiplies "the defendant state's annual expenditures on terrorism . . . by a factor usually ranging from three to five." <u>Flanagan v. Islamic Republic of Iran</u>, 87 F. Supp. 3d 93, 122 (D.D.C. 2015); <u>see, e.g.</u>, <u>Beer v. Islamic Republican of Iran</u>, 789 F. Supp. 2d 14, 26 (D.D.C. 2011) (adheres to standard factor of three). Plaintiffs argue that because Iran spends close to $1 billion a year on terrorism, this amount should be multiplied by five for a $5 billion punitive award. <u>See</u> Default J. Memo at 55. Recent decisions in this district, however, have found the <u>Flatow</u> method to be excessive, and this Court agrees. <u>See, e.g.</u>, <u>Flanagan</u>, 87 F. Supp. 93 at 122 (finding $1 billion excessive because it would be 53x each plaintiff's compensatory damages). This method was established and used when the prevailing estimate of Iran's terrorism spending was between $75—$200 million, and most punitive awards under this method were $300 million. <u>See, e.g.</u>, <u>Beer</u>, 789 F. Supp. 2d at 26; <u>Flatow</u>, 999 F. Supp. at 34; <u>Sutherland</u>, 151 F. Supp. 2d at 53; <u>Anderson</u>, 90 F. Supp. 2d at 114. Plaintiffs' principal support for their position includes <u>Valore</u>, a case that used the <u>Flatow</u> method and multiplied the Iran-terrorism-spending estimate of $200 million a year by five to award plaintiffs $1 billion in punitive damages. <u>See</u> 700 F. Supp. 2d at 89. It is important to note that this award was divided among almost 100 plaintiffs who were victims or relatives of victims of the Beirut embassy bombing. <u>Id.</u> If this Court follows the <u>Flatow</u> method and awards Plaintiffs $5 billion — or even $3 billion if it used a 3x multiplier — it would be the largest punitive-damage award from any court in this district against Iran under the FSIA, and it would be divided between only two Plaintiffs. This would be excessive.

The Court believes that the most appropriate method is the fourth one listed above — *i.e.*, making punitive damages equal to compensatory damages. This is the method adopted by several recent decisions in this district involving punitive damages against Iran under the FSIA. See e.g., Hekmati, 278 F. Supp. 3d at 167; Moradi, 77 F. Supp. 3d at 73. Further, Hekmati and Moradi have very similar facts to Plaintiffs' case, as both centered on Iranian-American citizens who were falsely imprisoned and tortured in Iranian prison. Moradi, 77 F. Supp. 3d at 60; Hekmati, 278 F. Supp. 3d at 149.

This method is also preferable to the other two employed by judges here — a flat $300 million award or a court-determined multiplier of compensatory damages. Some judges have implemented the flat $300 million award on the theory that a punitive award should be "reasonably predictable in its severity so that a bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another." Bodoff, 907 F. Supp. 2d at 106 (quoting Exxon Shipping Co. v. Baker, 554 U.S. 471, 502 (2008) (internal alterations omitted)). Others simply followed this example. See Oveissi, 879 F. Supp. 2d at 55–59 (awarding plaintiff $300 million based largely "in light of prior case law."). This method limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury, see Flanagan, 87 F. Supp. 3d at 124, and has recently been rejected by other courts. See, e.g., Hekmati, 278 F Supp. 3d at 166–67 (declining to use flat $300 million award); Moradi, 77 F. Supp. 3d at 73 (same). In addition, this Court's chosen method of doubling the compensatory damages also provides "a bad man" with a modicum of predictability.

Finally, the method of applying a court-determined multiplier of compensatory damages was only utilized in a special circumstance during actions against Iran by hundreds of plaintiffs who were family members or victims themselves of the Beirut bombing. See, e.g, Davis v.

30

Islamic Republic of Iran, 882 F. Supp. 2d 7, 17 (D.D.C. 2012) ($1.67 billion punitive damages award calculated by multiplying all plaintiffs' compensatory awards by 3.44). This Court sees no basis to use this method outside of that context. For these reasons, this Court awards Abedini $22,310,730 and Galangashy $1,273,858 in punitive damages, equal to their respective compensatory damage award.

In total, the Court will award $47,169,176 in damages to Plaintiffs, distributed as follows:

| Plaintiff | Pain and Suffering | Economic Damages | Solatium | Total Compensatory | Punitive Damages | Total |
|---|---|---|---|---|---|---|
| Saeed Abedini | $21,898,000 | $412,730 | | $22,310,730 | $22,310,730 | $44,621,460 |
| Zibandeh Abedini Galangashy | | $23,858 | $1,250,000 | $1,273,858 | $1,273,858 | $2,547,716 |
| Total | $21,898,000 | $436,588 | $1,250,000 | $23,584,588 | $23,580,141 | $47,169,176 |

## IV.     Conclusion

For these reasons, the Court will enter default judgment for Plaintiffs in the amounts listed above. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: November 13, 2019